**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

WILLIAM J. HUFF, II, as Trustee of the
William J. Huff, II, Revocable Trust
Declaration, Dated June 28, 2011, and
NICOLE E. HUFF, as Trustee of the
Nicole E. Huff Revocable Trust
Declaration, Dated June 28, 2011,

        *Plaintiffs,*

        v.

MONROE COUNTY, THE MONROE
COUNTY PLAN COMMISSION, and THE
MONROE COUNTY PLANNING
DEPARTMENT,

        *Defendants.*

Civil Action No. 1:22-cv-00812-JPH-TAB

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

William J. Huff, II, as Trustee of the William J. Huff, II, Revocable Trust Declaration,

Dated June 28, 2011, and Nicole E. Huff, as Trustee of the Nicole E. Huff Revocable

Trust Declaration, Dated June 28, 2011 (collectively, "the Huffs"), by counsel, hereby

bring this Complaint against Monroe County, the Monroe County Plan Commission,

and the Monroe County Planning Department. In support of this Complaint, the Huffs

allege as follows:

## NATURE OF THE DISPUTE

1.     The Defendants have instituted a years-long vendetta against the Huffs,

who are lawful owners of real property on Lake Monroe. Undeterred by court rulings

against them, a settlement that saw them paying money to the Huffs, or the plain

1

language of the ordinances they claim to apply and enforce, the Defendants have thrown up every obstacle they can come up with to prevent the Huffs from developing their property. Enough is enough. The violations of the Huffs' constitutional rights must be put to a stop.

## PARTIES AND RELEVANT NON-PARTIES

2.      William J. Huff, as Trustee of the William J. Huff, II, Revocable Trust Declaration, Dated June 28, 2011 ("William"), is an individual who is a citizen of and domiciled in Johnson County, Indiana.

3.      Nicole E. Huff, as Trustee of the Nicole E. Huff, II, Revocable Trust Declaration, Dated June 28, 2011 ("Nicole"), is an individual who is a citizen of and domiciled in Johnson County, Indiana. Nicole is married to William.

4.      Monroe County ("the County") is an Indiana county located within the Southern District of Indiana.

5.      The Monroe County Plan Commission (the "Plan Commission") is an advisory body to the Monroe County Board of County Commissioners. The Plan Commission reviews development proposals and conducts land use planning for the county.

6.      The Monroe County Planning Department (the "Planning Department") is a department of Monroe County. It acts as the primary coordinating agency in the development, adoption, and implementation of the County's land use plans and policies.

7.      Larry Wilson is the retired Director of the Planning Department.

8.      Jacqueline Nester Jelen is the Director of the Planning Department.

9.      David Schilling is an attorney for Monroe County.

## Jurisdiction and Venue

10.     This Court has general personal jurisdiction over Monroe County because it is a county located in the State of Indiana.

11.     This Court has general personal jurisdiction over the Planning Department because it is a county agency located in the State of Indiana.

12.     This Court has general personal jurisdiction over the Plan Commission because it is part of a county agency located in the State of Indiana.

13.     Pursuant to 28 U.S.C. §§ 1331 and 1367, this Court has federal question jurisdiction over this action because it arises in part under 42 U.S.C. § 1983. All supplemental state law claims arise out of the same case or controversy as the federal claims over which this Court has original jurisdiction.

14.     Pursuant to 28 U.S.C. § 1391, venue is proper in this District because the events giving rise to this action occurred in this District.

## Factual Allegations

15.     The Huffs own nearly 250 acres of real property (the "Huff Property") located between Shady Side Drive of The Shores subdivision ("The Shores") and the shore of Lake Monroe.

16. The Huffs purchased approximately 193 acres of the Huff Property by Special Warranty Deed from Terre Haute Realty, LLC on February 10, 2017.

17. The Huffs purchased approximately 45 acres by two Limited Liability Company Warranty Deeds from Chumley, LLC, both executed on April 20, 2017.

18. The Huff Property is accessible through a total of five different easements that were granted to the Huffs when they purchased the property. Some of the easements pass through The Shores on South Shady Side Drive.

**The First Logging Permit Application**

19. In April 2017 the Huffs began negotiations with Ohio River Veneer, LLC to conduct logging activities on the Huff Property.

20. When the County and the Plan Commission first discovered that the Huffs wanted to conduct logging activities on the Huff Property, they did everything in their power to block the Huffs' logging efforts every step of the way.

21. Larry Wilson, Director of the Planning Department, falsely told the Huffs that they were required to have a logging permit for any logging activity conducted anywhere on the Huff Property.

22. Indiana Code § 36-7-4-1103 prohibits "an ordinance or action of a plan commission that would prevent, outside of urban areas, the complete use and alienation of any mineral resources or forests by the owner or alienee of them."

23. Section 1103 defines "urban areas" as "all lands and lots within the corporate boundaries of a municipality, any other lands or lots used for residential purposes where there are at least eight (8) residences within any quarter mile square

4

area, and other lands or lots that have been or are planned for residential areas contiguous to the municipality."

24.     The majority of the Huff Property is located in a non-urban area, which does not require a logging permit under Indiana Code § 36-7-4-1103(b).

25.     Relying on Mr. Wilson's false statements, the Huffs and Iamur Wright, co-owner of Ohio River Veneer, began preparing a logging permit application for the Huff Property.

26.     Tammy Behrman, a Senior Planner with the Planning Department, informed Mr. Wright that the County calculates the urban areas by counting all platted subdivision lots regardless of whether there is a house on the lot or not. But Indiana Code § 36-7-4-1103(a) classifies "urban areas" as "any other lands or lots used for residential purposes where there are at least eight (8) residences within any quarter mile square area..." (Emphasis added.)

27.     On May 4, 2017, the Huffs and Ohio River Veneer submitted a logging permit application for 237 acres of the Huff Property. (Logging Permit Application, Ex. 1.)

28.     On June 2, 2017, Mr. Wilson notified the Huffs and Ohio River Veneer that the logging permit could not be approved until "the Grant of Easement is amended to expand the permissible uses to allow logging activities or there is a court order that declares that the proposed logging activities are allowed by the existing easement language." (Letter, Ex. 2.)

29.     Ohio River Veneer informed the Huffs that they would not start on the project unless and until the Planning Department approved the logging permit because Mr. Wilson made representations to Ohio River Veneer that made the company believe a logging permit was absolutely necessary to conduct any logging activities on the Huff Property.

30.     The Huffs worked with District Forester Ralph Unversaw with the Indiana Department of Natural Resources ("IDNR") to develop a Stewardship Plan subject to the Department's Best Management Practices, Invasive Species Practice Plan, and Timber Stand Improvement Practice Plan for the logging activities on the Huff Property. (Combined plans, Ex. 3.)

31.     On August 21, 2017, the Huffs sent a letter to Mr. Wilson informing him that they were withdrawing their application for a logging permit because they did not plan on engaging in any logging activities within the limited portion of the Huff Property that is located in the urban area. (Letter, Ex. 4.)

32.     Because of the Planning Department's refusal to issue the unnecessary permit and Mr. Wright's reliance on Mr. Wilson's false claims that a logging permit was absolutely necessary, Ohio River Veneer refused to start logging. On October 6, 2017, the Huffs had to pay $7,500 to terminate their contract with Ohio River Veneer and began looking for a new logging company. (Termination of Agreement to Purchase and Mutual Release and Receipt for Money, Ex. 5.)

**From the Start, the County and the Plan Commission
Planned to Block Any Logging on the Huff Property**

33.     On June 6, 2017, the Plan Commission held an Executive Committee Meeting and discussed the Huffs' logging permit application. Present at the meeting were Mr. Wilson and Mr. Schilling.

34.     According to the Meeting Minutes, the Huffs' logging permit was put on the agenda since the application was for "roughly 300 acres on Lake Monroe," and "anytime [they] have any type of activity like that on Lake Monroe it draws a lot of attention." Other members of the Executive Committee ("Committee") noted that Bloomington Mayor John Hamilton sent them a "long email" about the Huffs' permit application. (Meeting Minutes, Ex. 6.)

35.     The Committee realized that their hands were tied when it came to the Huffs' permit because of state law, Indiana Code § 36-7-4-1103, but that didn't stop them.

36.     They discussed some of the options they shared with Mayor Hamilton on ways to stop the Huffs' logging permit.

37.     Among these options included contacting the Indiana Utility Regulatory Commission ("IURC") and the Indiana Department of Environmental Management ("IDEM").

38.     Mr. Wilson then shared his "update" with the Committee which was "chopped with good news" because he had found a way to deny the Huffs' application temporarily. He explained the easement issues to the Committee and shared the letter

he sent to the Huffs and Ohio River Veneer refusing to issue the permit because of the issues with The Shores easements. (Ex. 6.)

39.     Committee member Julie Thomas said she had called Ohio River Veneer to complain about the proposed logging on the Huff Property—another attempt by County personnel to disrupt the Huffs' plans to log on their property.

40.     The Committee continued to discuss possible ways they could block the Huffs' logging permit in the event the Huffs resolved the easement issue, including: classifying the log landings in the application as home sites; contacting DNR Forestry, or if they refused, hiring a consulting firm to assist the Plan Commission in evaluating the logging plan to determine if some of it did not comply with common practices in the County; getting the Army Corps involved; or turning down the permit application because the logging plan essentially served as a development plan. (Id.)

41.     Mr. Wilson admitted, "if they have a logging plan we have no real basis for turning down a logging plan that comes in, follows Best Practices and is consistent with the way logging is practiced in Monroe County." (Id.)

42.     Despite the fact that the Huffs' logging plan did exactly that, their application still was not approved.

## The County Placed "Stop Work" Orders
## On the Huff Property Without Authority

43.     On September 25, 2017, the Planning Department placed "stop work" orders on the Huff Property.

44. On September 26, 2017, the Huffs' then attorney, Tom Malapit, emailed Mr. Wilson asking for the County's purpose and legal authority for issuing the "stop work" order.

45. Mr. Wilson responded that the "stop work" order was issued because the County saw construction equipment and believed "the area was being staged to begin earth-moving and vegetative removal activity" without permits for logging or site development activities.

46. Mr. Wilson further noted that without logging permits, they would treat any land disturbance or vegetative removal activity as land disturbing activity which requires a grading permit. (Emails, Ex. 7.)

47. The Huffs were not conducting any logging or land disturbing activities on the Huff Property when the "stop work" orders were posted. They were only doing maintenance on roads that had already been in existence on the Huff Property for many years, which predated the Huffs' purchase of the property. This activity did not constitute land disturbing activity as defined in Mr. Wilson's email in Exhibit 7.

48. Additionally, the Huffs' activities fell under some of the exemptions for issuance of a grading permit outlined in the Monroe County Zoning Ordinance (the "Zoning Ordinance")Chapter 816(A)(4) & (5), which include "agricultural use of lands" and "forest harvesting occurring in areas classified as rural in accordance with I.C. 36-7-4-1103." (Zoning Ordinance § 816, Ex. 8.)

49.     The "stop work" orders were used as yet another tactic to put obstacles in the way and make it more difficult for the Huffs to conduct any logging activity on their property.

## The Second Logging Permit Application

50.     In April 2018, the Huffs and Tri-State Timber, LLC submitted another application for a logging permit.

51.     Despite submitting all the required materials, the County continued to employ delay tactics over the course of several months to avoid issuing the Huffs the permit.

52.     Every time Mr. Malapit inquired about the status of the permit, the County made up new excuses as to why it had not been issued yet. These excuses included, among others:

a.      requesting a grading permit where one was not required;

b.      asking the Huffs to submit a new application for a portion of property that was included in the original application;

c.      requesting an updated logging plan;

d.      miscalculating and over-extending the slope restricted areas meeting the urban area definition;

e.      requiring that the Huffs have the slope restricted areas staked off even though this is not a requirement for a logging permit;

f.    requiring the construction of a new roadway where one was not required which would additionally require a grading permit, construction plans, and an erosion control plan; and

g.    incorrectly claiming that some parcels were not owned by the Huffs.

(Emails, **Ex. 9**.)

### The Shores Neighbors File a Lawsuit Against the Huffs

53.    On April 18, 2018, two neighbors from The Shores filed a lawsuit against the Huffs, seeking a declaration that the easements used by the Huffs did not authorize ingress and egress for commercial logging activity and an injunction prohibiting the Huffs from using the easements for commercial logging. (Complaint, **Ex. 10**.)

54.    On May 7, 2018, the trial court entered a preliminary injunction, enjoining the Huffs from using the easements "except for the construction, development and use by the Huffs of single family residential structures, which may include guest and caretaker quarters and other buildings attendant thereto." The court further ordered that the Huffs be enjoined from using the easements for "commercial logging or for hauling logs or trees, or forestry activity." (Order, Ex. 11.)

55.    The Huffs appealed.

56.    On March 11, 2019, the Indiana Court of Appeals vacated the trial court's order granting the preliminary injunction because it was overbroad as it enjoined the Huffs from activities on the Huff Property that would be necessary to develop the property and effectively prohibits them from accomplishing what is explicitly granted in the Grant of Easement.

57.     The Court of Appeals held, "[i]n order for reasonable development or use of the Huff Real Estate, it is clear that some prudent logging and removal of trees will be necessary and that the hauling and removal of trees would be essential in developing the Huff Real Estate as contemplated in the Grant of Easement." (Court of Appeals opinion, Ex. 12.)

### Further Attempts by the County and the Plan Commission to Block Logging on the Huff Property

58.     On September 12, 2018, Mr. Schilling emailed Mr. Malapit various photos showing that "a prefab building, gazebo components, building materials, and earth moving equipment" had been placed on the Huff Property and warned him that the Huffs were required to obtain an improvement location permit and a site plan approval from the County prior to placing any buildings or structures on the property.

59.     Mr. Malapit informed Mr. Schilling that the Huffs were not required to obtain an improvement location permit because the only structures that were on the Huff Property were used exclusively for agricultural production purposes, which do not require improvement location permits. Zoning Ordinance Chapter 814-1(B)(4). (Zoning Ordinance § 814, Ex. 13.)

60.     On May 8, 2019, a Notice was posted on the Huff Property from Building Commissioner Jim Gerstbauer, requesting that the Huffs contact the Monroe County Building Department regarding the project underway on the Huff Property.

61.     The Notice stated, "I have questions regarding the construction, permit status and/or location in Relation to property line setback requirements. Although

questions are not uncommon, it is essential they be resolved prior to completion of the project." (Notice, Ex. 14.)

62.     Nowhere on the Notice from Mr. Gerstbauer were the Huffs directed to stop work, as the County claims.

63.     None of the structures that were on the Huff Property involved or affected any electrical, plumbing, ventilating, heating or air conditioning systems or structural elements.

64.     A gazebo, a pavilion, and a shed were located on the Huff Property, and they were used exclusively for agricultural production purposes. The pavilion kept the straw dry that was used in the harvesting activities. The gazebo was a safe and sheltered area for agricultural workers to eat. The shed was used to store equipment, gas, oil, grass seed, and tools. The shed was not on foundation, allowing it to be moved around the property multiple times. No excavation activities were conducted when these structures were erected.

65.     According to Building Code Chapter 430-18, the "Building Department shall, on receipt of information of the violation of this Chapter, make an investigation of the alleged violation." The Building Department conducted no investigation. According to the Mr. Gerstbauer, the Building Commissioner, the "Building Department has had little involvement and has limited information" regarding the activities conducted on the Huff Property. (Building Commissioner Records Request, Ex. 15.)

66.     The County and Plan Commission filed a lawsuit against the Huffs on May 16, 2019, alleging that the Huffs had violated multiple ordinances and building

code provisions and seeking declaratory and injunctive relief. The Huffs filed

counterclaims for defamation per se, defamation per quod, invasion of privacy (false

light), and violation of substantive and procedural due process rights under Section

1983.

## The IDEM Inspection

67.     On May 29, 2019, the IDEM Office of Water Quality conducted an

inspection of the private logging operations on the Huff Property in response to

numerous complaints from residents of The Shores concerning clear cutting operations

and potential violations of 327 IAC 15-5 (Rule 5).

68.     The purpose of Rule 5 is to establish requirements for storm water

discharges from construction activities of one acre or more to protect the public health,

existing water uses, and aquatic biota. However, Rule 5 does not apply to persons who

are involved in agricultural land disturbing activities or forest harvesting activities.

69.     The inspection was conducted by Samantha Wickizer, a storm water

specialist with the IDEM Office of Water Quality.

70.     Ms. Wickizer summarized her findings in an Inspection Summary-

Advisory Letter ("the Letter") that was mailed to Mr. Huff on June 10, 2019. (Letter, Ex.

16.)

71.     The Letter indicated that Ms. Wickizer found no issues on the Huff

Property:

> a.   a permit was not required for the Huff Property under Rule 5 because
>
>       active forest harvesting operations were being conducted;

b. gravel drives were installed to minimize sediment tracking from the site;

c. only one section of the property was clear cut because the area was identified by IDNR as a diseased tree stand that was recommended to be removed;

d. silt fencing was installed along the perimeter of the area adjacent to Lake Monroe;

e. stabilization practices had been implemented and vegetation establishment was underway;

f. on the day of the inspection intermittent rains were occurring and no active erosion was observed; and

g. no grading operations were observed.

72. The Letter was cc'd to the IDEM Storm Water and Wetlands Section Chief Randy Braun, the IDEM Director of the Southeast Regional Office Mark Amick, and the Monroe County Municipal Separate Storm Sewer System Assistant Connie Griffin.

73. Through a Request for Public Records, the Huffs obtained documents indicating that Ms. Griffin sent an email to Mr. Schilling and Mr. Wilson on June 10, 2019 that contained a short memo detailing Ms. Griffin's phone conversation with Ms. Wickizer regarding the Huff inspection. (Documents received through the Request for Public Records, Ex. 17.)

74. The memo indicated that the IDEM inspection found: no Rule 5 Permit required because logging/forest is not a regulated activity and is exempt from permit

requirements; no grading activity noted; in Ms. Wickizer's opinion, the Huffs have "gone above and beyond Best Management Practices for logging activity;" and the only structure on the property was a small shed not on foundation.

75. On June 12, 2019, Ms. Griffin forwarded an email from Ms. Wickizer containing the Letter to Mr. Schilling and Mr. Wilson which said the site does not require an IDEM permit for land disturbing activities.

76. Mr. Wilson testified that he had a conversation with Ms. Wickizer "fairly immediately after receiving that letter." (Wilson Dep. Tr., p. 175:9–13, Ex. 18.) According to Mr. Wilson, Ms. Wickizer indicated she did not know about IDEM guidance in regard to Rule 5. (Id. 175:15–19.)

77. However, Ms. Wickizer indicated she did not recall having any conversations with Mr. Wilson, and that she has "never said to Larry Wilson, or anyone else, that I am unaware of IDEM's guidance on Rule 5 or that I do not understand Rule 5's application. (Wickizer Affid., Ex. 19.)

**Enforcement Procedures Under Zoning Ordinance § 817-3**

78. On August 3, 2019, the Huffs filed a Motion to Dismiss the County's complaint under Indiana Trial Rule 12(B)(1) for lack of subject matter jurisdiction because the County failed to follow the enforcement procedures set out in Zoning Ordinance Chapter 817-3 before filing suit. (Zoning Ordinance § 817-3, Ex. 20.)

79. Zoning Ordinance Chapter 817-3 requires that the Administrator send written notice to a violator indicating the nature of the violation and ordering the action necessary to correct it. The final written notice shall state what action the Administrator

intends to take if the violation is not corrected. Then, if the violation is not corrected, the Administrator shall seek the approval of the Board of Zoning Appeals ("BZA") to file a lawsuit to enforce zoning ordinance violations.

80.     None of these procedures were followed before the Plan Commission and the County filed its lawsuit this lawsuit.

81.     The Huffs never received a formal written notice from the Administrator indicating the nature of the violation and ordering the action necessary to as prescribed by Zoning Ordinance Chapter 817-3(B).

82.     The County claimed that Mr. Schilling's email to Mr. Malapit on September 12, 2018 constituted adequate notice. But the email makes no mention of specific ordinance violations that the County sought to enforce, like the need for a land use certificate, erosion and drainage control plan, or the ECO Zone slope variation. Moreover, the email was sent by Mr. Schilling rather than by the Administrator as required by the ordinance.

83.     The County also never sought approval by the BZA before filing its lawsuit, as required by Zoning Ordinance Chapter 817-3(D).

84.     In response to the Huffs' argument that the County failed to comply with Zoning Ordinance § 817-3, the County argued that Mr. Schilling was included in the term "Administrator" because the county attorney assists the Administrator with enforcement of the zoning ordinances.

85.     The County also argued it did not need to seek BZA approval before filing suit because the exception in Zoning Ordinance Chapter 817-3(E) applied. The

exception allows the bypass of BZA approval "in cases where delay would seriously threaten the effective enforcement of the ordinance or pose a danger to the public health, safety or welfare."

86.     The County raised this argument for the first time in Plaintiffs' Brief in Opposition to the Huffs' Motion to Dismiss. In the original Complaint, Plaintiffs never once made reference to Zoning Ordinance Chapter 817-3. In Paragraph 3 of the original Complaint, the County stated it had authority to initiate legal proceedings "pursuant to IC 36-7-4-1014 and Sections 817-2 and 4 of the Zoning Ordinance."

### The BZA Special Meeting

87.     Just hours after the hearing on October 3, 2019, Mr. Wilson sent an email to the BZA indicating that they needed "to schedule a short (10 to 15 minutes) meeting of the Board of Zoning Appeals on Monday, October 7, 2019, to approve decisions on pending litigation." The Public Notice for the Special Meeting stated that the pending litigation to be discussed, among others, was the litigation involving the Huffs. (BZA Emails, Ex. 21; Public Notice, Ex. 22.)

88.     The Special Meeting was held in a different location than the BZA's monthly meeting and thus, was not publicly televised as usual. Instead, the meeting was recorded.

89.     The Huffs obtained a copy of the Special Meeting recording through a Request for Public Records. (Recording, Ex. 23.)

90.     As evidenced by the recording, at the Special Meeting, Mr. Wilson and Mr. Schilling started out by discussing the Planning Department's enforcement procedures under Zoning Ordinance Chapter 817-3 with the BZA.

91.     Mr. Schilling explained that it is the County's practice to seek BZA approval, under Chapter 817-3(D), only in situations where the Administrator, Mr. Wilson, believes "administrative expertise" is necessary in determining whether to file a lawsuit. In all other cases, they go straight to court without BZA approval. Mr. Schilling specifically stated that the County has followed this practice for over twenty years. (Ex. 23.)

92.     It was in following this widespread practice that Mr. Wilson, as the Administrator, decided to file this lawsuit against the Huffs without first seeking BZA approval. (Id.)

93.     Mr. Schilling and Mr. Wilson then asked the BZA to retroactively ratify Mr. Wilson's decision to file the lawsuit under Zoning Code Chapter 817-3(D). Mr. Schilling explained that it was not until after the hearing on the Motion to Dismiss that they thought to get BZA approval to dispense with the Huffs' argument that the County and the Plan Commission didn't follow their internal procedures before filing suit. (Id.)

94.     Mr. Schilling admitted that they called the Special Meeting to get approval instead of waiting for the BZA's regularly scheduled monthly meeting because they needed approval as soon as possible to file the Amended Complaint before the Huffs

filed an answer, which would require them to seek Court approval to file the Amended Complaint. (Id.)

95.     BZA member Mark Kruzan, former Mayor of the City of Bloomington, questioned the process through the special meeting calling the entire process a "bastardization" of the normal way that the BZA works, and ultimately left the meeting. (Id.)

96.     Mr. Schilling and Mr. Wilson falsely implied to the BZA that the Huffs' activities were harmful to the Lake Monroe environment. They intentionally withheld the information provided by IDEM and the Rule 5 Letter as admitted by Mr. Wilson in his deposition. (Ex. 18, p. 174:1–23.)

97.     Furthermore, on July 16, 2020 during a Preliminary Injunction Hearing, an attorney for Defendants made a judicial admission that the Defendants did not have an expert to talk about water quality, nor did Defendants have proof that the Huffs damaged Lake Monroe. (Prelim. Inj. Hrg. Tr., p. 53, Ex. 24.) They led the BZA to believe that the Huffs' activities posed a risk to public health, even though neither had any reason to believe that it was true. As a result, the BZA voted to approve Mr. Wilson's decision to file the original suit.

98.     Three days later, the Amended Complaint was filed, citing Zoning Ordinance Chapter 817-3, for the first time, as the County's source of authority for bringing the lawsuit. (Am. Compl., Ex. 25.)

**The Settlement**

99.     The Parties participated in mediation on October 12, 2020 under the initial lawsuit, cause number 53C06-1905-PL-001125 in Monroe County and all pending issues.

100.     The Parties reached an agreement under cause number 53C06-1905-PL-001125 which was executed by the attorneys laying out the terms of the settlement. (Settlement Agreement, Ex. 26.)

101.     Subsequent to entering into the Settlement Agreement, the County has engaged in improper and illegal conduct to prohibit the Huffs' use of the property.

102.     The Huffs have been shuffled back and forth for years between the County's Planning Department, Building Department, Health Department, Stormwater Department and Highway Department without clear direction on how to proceed.

103.     Following the settlement of the lawsuit, the County  suddenly began to require the Huffs to undergo a site plan review under Zoning Ordinance Chapter 815. Before the settlement, site plan reviews were not required for agricultural and residential projects. Regardless, the Huffs attempted to comply with the County's demand for a site plan review.

104.     Beginning in March of 2021, the Huffs went above and beyond the requirements to begin the process of development of their Real Property by asking for a Pre-Design or Pre-Filling Meeting.

105.     Ms. Nester Jelen refused a meeting, stating that a Pre-Design meeting was only required for subdividing property or rezoning a Planned Unit Development. (3/31/21 Email, Ex. 27.)

**The Barn**

106.     The Huffs provided to the County information including plans for the construction of their barn and gate.

107.     The Planning Department does not have the authority to regulate agricultural land uses. Despite the fact that the barn was for agricultural purposes, the Defendants have made approval of the barn structure virtually impossible to achieve. (3/11/21 Email, Ex. 28.)

108.     On March 3, 2021, the Huffs applied for a variance related to the planned height of their barn. Ms. Nester Jelen responded with three critiques: (1) "I suggest that you first submit an application for a use determination to determine the use of the proposed barn structure on the property before we proceed with the variance application"; (2) the site plan "shows your construction envelope is encroaching into the 12% slope"; and (3) "your site plan is required to show the boundaries of your legal lot of record." She demanded a new site plan and "stopped" the variance application.

109.     On March 8, 2021, the Huffs responded, stating that they are "clearly outside the 12%" and the County "should have all of our records." Ms. Nester Jelen responded, "[t]hough the building is located within areas less than 12% slope, we also need to make sure all grading for the building takes place within areas less than 12% slope." The Huffs responded that "the barn is well within the 12% and only needs 4 feet outside the build for grading. Clearly by the scale we are not even close to the 12% line," also noting that their engineer and architect were "shocked" by the delays.

110. On March 8, 2021, the Huffs submitted an application for a Use Determination for the barn. Two days later, Mr. Huff wondered why there was a delay, noting again that the "use for my barn is for my agricultural purposes. Why is this an issue?" Ms. Nester Jelen responded, asking the Huffs to "describe all uses for which the barn structure will be utilized," "describe the current use" and acreage on one of the Huffs' tracts, describe what "agricultural products and/or equipment" the barn will be used to store, and state how many employees will be using the barn. The Huffs provided the information.

111. On March 16 and again on March 22, Ms. Nester Jelen stated that she would "get back to you in a reasonable amount of time." On March 31, 2021, Ms. Nester Jelen instructed the Huffs to apply at the Building Department for a building construction permit.

112. On April 7, 2022, the Huffs submitted an application with the Building Department for a Residential Agricultural Structure Permit. Misty Deckard responded, "we require building plans/construction drawings. Does this project have an address?" Mr. Huff replied, "I am trying to get a site plan approval. There is no address, just Shadyside Drive."

113. In response, Misty Deckard told Mr. Huff to go back to the Planning Department for a site plan approval. He responded that he could not find a place in the Planning Department portal to submit his plan because there is only a place to submit site plans for commercial property, not for residential properties. He told Ms. Deckard that Ms. Nester Jelen had told him to apply for a building permit. Ms. Deckard

responded, "I see that she told you to apply for a building permit. To get one we require building plans/construction plans."

114.    On April 9, 2022, the Huffs submitted a new application for a residential agricultural structure permit. Mr. Huff remarked that he was "only looking for a site plan approval and I was instructed to fill this out…I am trying to get site plan approval for residential and agricultural use. We continue to be delayed in the process…and now direction to file a site plan application that does not exist. Please let me know what I need to do in this process." Ms. Deckard again told him to contact the Planning Department.

115.    Ms. Nester Jelen reentered the conversation on April 14, telling him that he "submitted a building permit application for a residential building…As Misty from the Building Department has communicated, you will need to upload proper construction/building plans into the attachments for the Building Department Review." Ms. Nester Jelen also stated that there were "deficiencies" in the Huffs' site plan, "including (but not limited to) not seeing all structures being located, lack of engineer certification, and lack of erosion control. Additionally, you are proposing a home that expands over lot lines and will require additional processes…Lastly, the Highway Department requires submission of a full Stormwater Pollution Prevention Plan (SWPPP) for the review to proceed, and may also require other permits/approvals through this application process. Until a full submittal is uploaded, we will not begin our review…" She "stopped" his application.

116.     Mr. Huff responded, "Again, I am only trying to get a site plan approval. This is where you instructed me to go and apply." Ms. Nester Jelen then contradicted her earlier instruction to him, stating that "if you would like site plan review that would include both the Highway and Planning Departments ahead of filing for a building permit, the process is to file for a full site plan."

117.     Mr. Huff wondered, "What do I need from the Highway Department? I finally got an email from Ben Ayers [of the Highway Department] stating 'This segment of South Shady Side Drive is a privately maintained roadway." Again, the attachment that you are sending me to is for Commercial use or Change of Use which neither apply to me. Please provide me the right link to go to." He also noted, "Misty directed me back to the Planning Department. Now you are directing back to the Building Department. We are only applying for one structure on these 2 parcels. What additional processes do I need? We own both parcels. Why do I need an engineer certification? Does my Architect seal work? What work needs to be done on the lot line encroachments? What is wrong with what we provided? What needs worked on? Why is my application 'Stopped and Denied' and not 'Active'? Isn't the process to provide comments and work with the land owner? I went thru the Highway process and just find out (finally) that we are on a private road."

118.     At the beginning of the entire process, in an attempt to work with the County, the Huffs met with Mr. Baker, Mr. Schilling, and Ms. Nester Jelen on April 9, 2021. The meeting was recorded. (Recording, Ex. 29.)

119.     In accordance with the Settlement Agreement, the County was provided a map designating the "urban" area (Ex. 30). Ms. Nester Jelen indicated that the map would be reviewed and a response provided within a week of the April 9, 2021 meeting. (Ex. 29, 1:27:26.) No response has ever been provided.

120.     Instead, on May 6, 2021, Ms. Nester Jelen emailed Mr. Huff indicating that the entirety of the approximately 25.33 acre parcel (the "Huffs' Chumley Property") was part of the "urban" area, thereby denying the Huffs the right to log without a permit. (Email, Ex. 31.)

121.     At the April 9, 2021 meeting, the Huffs presented a site plan for the County's consideration.  The County stated in a series of emails with ever-changing reasoning that they would set up a meeting to review the site plan (Ex. 29, 23:26); that a meeting would be set up after April 26, 2021 to discuss the site plan (id., 1:01:05); that an explanation to the manner in which the "urban" area map was originally calculated by the County would be provided (id., 1:22:45); that a response to the number of guest homes allowed in an ECO Zone would be provided within a week (id., 1:59:15); that a determination would be made in the next week on the Huffs' Chumley property to determine if a guest home could be constructed (id., 2:10:00); that the County would expedite answers to the Huffs (id., 2:18:45).

122.     Further, a discussion regarding the barn and gate ensued where the County admitted that the delay in processing the Huffs' application to construct their barn was related to a concern the barn was not for agricultural purposes, but represented that it would be considered as agricultural and delays would cease and

acknowledged the Huffs' frustration on the delay on the barn was reasonable. (id., 4:10-7:08).

123.    The Huffs relied upon the County's assurances made during the April 9, 2021 meeting in relation to the barn and continued to attempt to work to receive final approval.

124.    As of the date of this complaint, the County has not responded to any of the promises made in the April 9, 2021 meeting nor have the Huffs been allowed to proceed with their barn or gate.

125.    Instead, the County has engaged in a practice of delaying and placing requirements upon the Huffs which have not been required of any other landowner.

### The Residences

126.    On March 3, 2021, the Huffs applied for an Improvement Location Permit. Rachel Henry responded, stating that the Huffs would also need a Building Permit and that they "need[ed] to re-apply for this as a Residential Accessory Structure Permit on the Building Department tab of our online portal." Ms. Henry instructed the Huffs to submit "a more detailed site plan…show[ing] distances to property lines from the new structure, any driveway used to access the structure, any easements or sinkholes and any septic systems on the property." She then "stopped" the application.

127.    Mr. Huff responded, "[t]here is no septic to the building so why how [sic] do I show one?" Ms. Henry agreed that if "there is no septic on the site, then you do not need to show one on the site plan." Mr. Huff responded, asking what his application was missing as he believed they had submitted everything she mentioned. Ms. Henry

responded, the application "needs to go through the Building Department as this structure also needs a Building Permit."

128.    On March 3, 2021, the Huffs submitted an application for a "Pre-Design" for their planned residences. A week later, Ms. Nester Jelen responded, "I would first like you to provide how many legal lots of record you have for our review…We do not currently permit all 3 of those [planned] structures to be located on 1 legal lot of record."

129.    On March 12, 2021, Mr. Huff responded, "Can you send the code citation that does not allow 3 structures on one legal lot of record? My team can not find the citation."

130.    Ten days later, Ms. Nester Jelen stated she would get back to the Huffs "in a reasonable amount of time." On March 31, 2021, Ms. Nester Jelen stated that a predesign "is only required for subdividing property, or rezoning to a Planned Unit Development." She told him he could apply for permits at any time and that the County would "require a site visit" before any approvals. She instructed him to submit an updated site plan when he applied for permits.

131.    On March 25, 2021, the Huffs submitted an application for a pre-design or pre-filing meeting for their planned home sites. Ms. Nester Jelen "stopped" the application, instructing the Huffs to "file for a site plan and building permits." Mr. Huff responded, 'I think we did do what you are asking." Ms. Nester Jelen disagreed, stating that "we are looking for a site plan filing and building permit applications."

132.    The Huffs' struggles have continued in 2022. On April 26, 2022, Misty Deckard of the Building Department told Mr. Huff that he needed to fill out a residential accessory application for his guest house.

133.    On April 27, 2022, the Huffs filed this Complaint.

134.    On May 4, 2022, Mr. Huff responded to Ms. Deckard, stating that a residential accessory structure permit is required only if the building is in excess of 120 square feet, but their planned gate house is only 90 square feet, meaning that no permit is necessary.

135.    On May 4, 2022, Ms. Deckard responded, with no explanation, that "this project is on hold" and directed Mr. Huff to "contact County Planning with any questions."

## Septic

136.    On March 8, 2021, the Huffs submitted four applications for four septic permits. They submitted a fifth septic application on August 30 and a sixth on September 1, 2021.

137.    The County determined that a flood plain review was necessary even though the property is not in a flood plain. On October 6, 2021, Mr. Huff asked, "How long does it take for a floodplain review?" On October 14, Tammy Behrman responded, asking for an updated septic system location map.

138.    On October 19, 2021, Ryan Cushman directed the Huffs to find a new location for two of the proposed septic tanks. On November 18, 2021, the Huffs told Mr.

Cushman that they found a different site for each of the tanks. The Huffs reached out multiple times over the ensuing weeks and received no response.

139. Finally, on December 16, 2021, Mr. Cushman noted that the applications were under "the Floodplain Review step" with the Planning Department. On January 10, 2021, three of the six pending septic permit applications were approved.

140. A series of back and forth communications occurred between Ms. Behrman and Mr. Huff in which Ms. Behrman repeatedly identified certain issues (which were not actually issues) related to the septic systems. On February 10, 2022, Mr. Huff communicated his frustration:

> Tammy, How does the Planning Department have authority on me getting a septic permit? We have met every requirement by the Health Department to get our permit. Clearly, we are not in the flood plain. Now you ask me to do a Pre-Conference or Pre-Filing meeting which is for a Subdivision or Pud Petition which clearly this is just a residential building. My understanding that this is the first request "EVER" by the county to ask a land owner to go thru this process…The health department, our engineer, and soil scientist have determined the best place for the septic system…Our statutory right to a permit within 45 days has passed. I am clearly being targeted by the county. I request my permit within 24 hours.

The next day, the three remaining septic permit applications were approved.

141. The County failed to issue a decision on three of the permits until January 10, 2022 (133 days from the date of application); one on February 11, 2022 (340 days from the date of application); and one on February 14, 2022 (343 days after the date of application), despite requirements to do so within 45 days under 410 IAC 6-8.3-53(g).

**Grading Permit**

142.    On April 21, 2022, the Huffs submitted an application for a Grading

Permit.

143.    On April 27, 2022, Ms. Nester Jelen stated the application was incomplete

because it did not include "existing and proposed contour lines of the areas where you

are proposing grading." Additionally, "you are in need of a full Stormwater Pollution

Prevention Plan (SWPPP) for review."

144.    Huff wondered, "why do I need a grading plan when I am not switching

uses on my land?"

145.    He submitted a Stormwater Inquiry form and was told, "For County

grading permits and any submissions for project review, please contact the Planning

Department[.]"

146.    The permit application was then "stopped" without explanation.

**April 2022 Site Plan Stoppages**

147.    On April 19, 2022, Huff submitted four site plan applications that were

assigned internal docket numbers SIT-22-12, SIT-22-13, SIT 22-14, and SIT 22-15

(collectively referred to as the "Site Plan Applications.")

148.    Subsequent to Huff filing the Site Plans with Monroe County, Ms. Nester

Jelen emailed Mr. Huff and advised the Site Plan Applications were "stopped."

149.    On or about March 23, 2022 a proposed text amendment requiring

certified plot plans for new residential construction was initiated by Monroe County

Planning Department. This proposed text amendment was heard and passed at the Monroe County Commissioners meeting on April 27, 2022.

150. On April 25, 2022, the Huffs received comments from Ms. Nester Jelen indicating that each of their four site plans had been denied and/or "stopped." The reasons articulated by Ms. Nester Jelen for the denials and/or stoppages are without basis in fact or law—and some are simply false.

151. The justifications for the denials/stoppages of Site Plans 22-12 and 22-13 are identical and essentially include a requirement for a "certified plot plan" as set forth under the new proposed text amendment to Chapter 815 of the Monroe Zoning Ordinance:

| Site Plan SSIT-22-12: Plan for Agricultural Barn<br>Site Plan SSIT-22-13: Plan for Guest Home | |
|---|---|
| **Justifications for Denial or Stoppage** | **Reasons Justifications are False and/or Incorrect** |
| The site plan is missing an illustration of "all structures (including septic connection lines, culverts, etc.) listing setbacks from property lines" | The site plan contains all the information that Ms. Nester Jelen related to the project. The septic tank is identified, there are no culverts, and the setbacks are identified. (**Ex. 32.**) |
| The site plan is missing "a subscribed statement of an engineer or architect, licensed by the State of Indiana, certifying that the proposed activity will satisfy the performance standards of Chapter 802 of this ordinance" | The site plan includes the seal and signature of Clete A. Kunce as certification. In Mr. Kunce's practice, the seal and signature has satisfied the certification requirements in the jurisdictions he has practice in, including Monroe County, Indiana. (Clete Affid., **Ex. 33.**) |

| | |
|---|---|
| The site plan is missing "more" | Ms. Nester Jelen offers no specific information about what "more" is missing. |
| "The Highway Department requires submission of a full Stormwater Pollution Prevention Plan (SWPPP) for the review to proceed, and may also require other permits/approvals through this application process. Until a full submittal is uploaded, we will not begin our review and will deny this application. For now we have stopped your application and it can become active again once a complete filing has been made." | The Huffs are not required to submit a SWPPP because agricultural and residential uses are exempt from Rule 5. Regardless, they *did* submit a SWPPP as part of SSIT-22-12, covering the entire property. (**Ex. 34.**)<br><br>Furthermore, as identified by Ms. Nester Jelen, this requirement falls under the jurisdiction of the Highway Department. Ben Ayers, Project Manager for the Monroe County Highway Department, indicated that "This segment of South Shady Side Drive is a privately maintained roadway" and made no request for any additional information regarding the SWPPP. (**Ex. 35**.) |
| "In addition, since you have applied for 3 other site plans that gain access through the newly created access drive and the 'main vacation home' will cutoff [sic] the access through the pre-existing drive, we will not be able to proceed with the site plan approval until you have applied for and received approval from the Board of Zoning Appeals from Chapter 825. Chapter 815-4(D), for examples, requires site plans must comply with 'any general standards provided in this ordinance'" | The Huffs fall into an exemption to Chapter 825 for existing parcels of record for which there are no sites for the construction of a building, associate driveway and utilities under Chapter 825-5 of the Monroe County Code. |

152.    The justifications for the denial of Site Plan 22-14 fare no better:

| Site Plan SSIT-22-14: Plan for Guest Home | |
|---|---|
| **Justifications for Denial or Stoppage** | **Reasons Justifications are False and/or Incorrect** |
| "This permit application location does not show a location of a guest home on the site | The site plan includes the location of the "guest home" identified as the Proposed |

| | |
|---|---|
| plan. Please either update your site plan or let staff know of the correct location of the proposed structure. *As such, we have denied your application until it can become active again once a complete filing has been made.*" | Residence. (**Ex. 36.**) Furthermore, the Construction Plans attached to the application, lay out the specific rooms within the "guest home" in the same footprint. (**Ex. 37**.) |
| "In addition, since you have applied for 3 other site plans that gain access through the newly created access drive and the 'main vacation home' will cutoff [sic] the access through the pre-existing drive, we will not be able to proceed with the site plan approval until you have applied for and received approval from the Board of Zoning Appeals from Chapter 825. Chapter 815-4(D), for examples, requires site plans must comply with 'any general standards provided in this ordinance'" | The Huffs fall into an exemption to Chapter 825 for existing parcels of record for which there are no sites for the construction of a building, associate driveway and utilities under Chapter 825-5 of the Monroe County Code. |

153. Finally, the justifications for Site Plan 22-15 are also incorrect and/or false:

| Site Plan SSIT-22-15: Plan for Main Vacation Home | |
|---|---|
| **Justifications for Denial or Stoppage** | **Reasons Justifications are False and/or Incorrect** |
| The site plan is missing an illustration of "all structures (including septic connection lines, culverts, etc.) listing setbacks from property lines" | The site plan contains all the information that Ms. Nester Jelen related to the project. The septic tank is identified, there are no culverts, and the setbacks are identified. (**Ex. 38**.) Furthermore, the Septic or Sewer plan, attached to the application, lays out the septic connection lines. (**Ex. 39**.) |
| The site plan is missing "a subscribed statement of an engineer or architect, licensed by the State of Indiana, certifying that the proposed activity will satisfy the performance standards of Chapter 802 of this ordinance" | The site plan includes the seal and signature of Clete A. Kunce as certification. In Mr. Kunce's practice, the seal and signature has satisfied the certification requirements in the jurisdictions he has practice in, including Monroe County, Indiana. (**Ex. 33**.) |

| | |
|---|---|
| The site plan is missing "more" | Ms. Nester Jelen offers no specific information about what "more" is missing. |
| "The Highway Department requires submission of a full Stormwater Pollution Prevention Plan (SWPPP) for the review to proceed, and may also require other permits/approvals through this application process. Until a full submittal is uploaded, we will not begin our review and will deny this application. For now we have stopped your application and it can become active again once a complete filing has been made." | The Huffs are not required to submit a SWPPP because agricultural and residential uses are exempt from Rule 5. Regardless, they did submit a SWPPP as part of SSIT-22-12, covering the entire property. (**Ex. 34.**) Furthermore, as identified by Ms. Nester Jelen, this requirement falls under the jurisdiction of the Highway Department. Ben Ayers, Project Manager for the Monroe County Highway Department indicated that "This segment of South Shady Side Drive is a privately maintained roadway" and made no request for any additional information regarding the SWPPP. (**Ex. 35.**) |
| "You have also listed 'guest parking' outside of the 12% or less slope area (pg. 6 of uploaded Site Plan from April 19, 2022), as well as the relocated access drive outside of the 12% or less slope area." | This is the only justification Ms. Nester Jelen has provided that is applicable. The Huffs have filed a revised plan removing the 'guest parking'. |
| "In addition, your main home is located over lot lines and requires further processes to remedy. The guest parking and relocated access drive (as well as any other structures requiring Improvement Location Permits) will either need to be removed from the site plan and the site, or variance(s) from Chapter 825 must be applied for and approved for variance(s) by the Board of Zoning Appeals prior to Site Plan approval." | The Huffs own both parcels and the County has failed to indicate what regulation or processes are needed to build across both properties. |
| "Since you have applied for 3 other site plans…that gain access through the newly created access drive and the 'main vacation home' will cutoff [sic] the access | The Huffs fall into an exemption to Chapter 825 for existing parcels of record for which there are no sites for the construction of a building, associate |

| | |
|---|---|
| through the pre-existing drive, we will not be able to proceed with the site plan approval until you have applied for and received approval from the Board of Zoning Appeals from Chapter 825. Chapter 815-4(D), for examples, requires site plans must comply with 'any general standards provided in this ordinance'" | driveway and utilities under Chapter 825-5 of the Monroe County Code. |

154.     The new text amendment in Chapter 815 requires a "certified plot plan" for new residential construction and defines a "certified plot plan" to be a drawing that is prepared by and signed off by a surveyor, engineer, or architect, showing areas of proposed and existing improvements with accurate property boundaries and other necessary site features."

155.     The Huff Site Plan Applications pertain to residential construction.

156.     The Plan Commission issued a press release that pertains to the proposed text amendment for Chapter 815. (Amended Ordinance, Ex. 40)

157.     The press release states that the text amendment change "will not affect applications for accessory structures, additions to existing single family or two-family homes, or interior remodels." (Press Release, Ex. 41).

158.     The press release further states: "Note that there will be situations- such as instances where property lines are unclear, or where easements or other features impact proposed building locations-where a certified plot plan may still be requested."

159.     The press release goes on to say that "certified plot plans are a vital tool for homeowners in the building process and throughout their time owning an

developing a property. In addition to confirming property lines and related setback requirements, certified plot plans help identify existing areas of concern on the property in regards to steep slope, karst features, buildable area, drainage concerns, and easements that could cost homeowners extra money in building, maintenance, and damage repair costs in the future. Certified plot plans also help avoid delays in processing applications due to inaccurate or insufficient information submitted for review."

160.     The text amendment to Chapter 815 changes the requirements of the Site Plan Review Process for residential structures to require a certified plot plan for any new principal use structures that are identified in the proposed ordinance. (Ex. 40).

161.     The current enacted version of Chapter 815-3 provides that only if the Administrator deems it necessary, the Administrator may require an applicant to provide a subscribed statement of an engineer or architect, licensed by the State of Indiana, certifying that the proposed activity will satisfy the performance standards of Chapter 802 Ordinance.

## Unlawful Interference with the Chumley Property

162.     Indiana law prohibits a planning commission from enacting an ordinance or taking any action that would prevent, outside of urban areas, an owner's complete use of forests on his property. Ind. Code § 36-7-4-1103(b).

163.     "Urban areas" include (i) all lands within the corporate boundaries of a municipality, (ii) any other lands used for residential purposes where there are at least

eight residences within any quarter mile area, and (iii) other lands that have been or are planned for residential areas contiguous to the municipality. I.C. § 36-7-4-1103(a).

164.    The Huffs' Chumley Property is not an "urban area" under state law.

165.    The County has further restricted the definition of "urban areas" to include only "an area subject to utility services as shown on the Urban Services Boundary Map or an area within 660 feet of utility service facilities as shown on the Urban Services Boundary Map." Zoning Ordinance Chapter 801-2.

166.    The Huffs' Chumley Property is not an "urban area" under the Zoning Ordinance, either.

167.    Despite the fact that it has no lawful basis to restrict the Huffs' use of the Huffs' Chumley Property, the County has repeatedly required the Huffs to apply for a logging permit and pay an associated license fee before performing any logging on the Huffs' Chumley Property.

168.    Larry Wilson confirmed the County's unlawful practice when he testified that although the County cannot restrict the complete use of forests in non-urban areas, it nevertheless requires an owner to obtain a logging permit for such non-urban areas. (William J. Huff, II Revocable Trust Declaration, Dated June 28, 2011 v. Cain, Tr. At 13-14 (May 13, 2018), Ex. 42).

169.    The County requires a petitioner to submit an application for a logging permit, called a "Logging Permit Checklist," which requires a petitioner to submit numerous items, including (a) current deeds, (b) completed driveway permit application, (c) letter of consent, (d) detailed logging site/harvest plan, (e) a list of Best

Management Practices, (f) a filing fee of $200 if the property is outside the Lake Griffy or Lake Monroe watersheds, or $400 if the property is within the Lake Griffy or Lake Monroe watersheds.

170.    The Logging Permit Checklist provides the petitioner with "Useful Code References," including Zoning Ordinance Chapters 816-2, 816-4(E)(2), 825-3, and 829-3. None of these provisions is applicable to the Huffs' Chumley Property, as explained below:

a.  Zoning Ordinance Chapter 816-2 applies to all persons who propose any land disturbance <u>except</u> "forest harvesting occurring in areas classified as rural in accordance with I.C. 36-7-4-1103." Zoning Ordinance Chapter 816(A)(5).

    i.  The Huffs' Chumley Property is classified as rural under I.C. § 36-7-4-1103, so this Chapter does not apply to it.

    ii.  Interestingly, even if the Huffs' Chumley Property were urban, there would be no permit required (contrary to the County's demands). Indeed, the same Chapter provides that petitioners who propose forest harvesting in areas classified as urban in accordance with I.C. § 36-7-4-1103 "shall only be required to submit a plan that details compliance with the Best Management Practices described in 'Best Management Practices. Protecting the Woods While Harvesting'- IDNR, 'Logging and Forestry BMP's for Water Quality in Indiana' – IDRN, and any other recognized Best Management Practices adopted by the Indiana Department of Natural Resources." MCC Chapter 816-2(E).  And as noted above, Ms. Wickizer found that the Huffs have "gone above and beyond Best Management Practices for logging activity." (**Ex. 17**.)

b.  Zoning Ordinance Chapter 816-4(E)(2) provides, in relevant part, that "[f]or logging harvesting permits not otherwise exempted by this Chapter the performance guaranty shall be the aggregate of a fixed amount for each road cut proposed".

    i.  It is not clear what a logging *harvesting* permit refers to because it is referenced nowhere else in the MCC.

ii. What is clear, however, is that this provision does not apply to the Huffs' Chumley Property because it is "otherwise exempted by this Chapter" due to its rural character.

c. Zoning Ordinance Chapter 825-3 prohibits logging operations except for "[s]elective logging operations, as defined in the *Best Management Practices Handbook* from the Forest Practices Working Group of the Indiana Department of Natural Resources, subject to securing a logging permit form the County Planning Department . . ." Zoning Ordinance Chapter 825-3(1)(b).

i. That provision is only applicable, however, to land within riparian buffer zones, which are measured from the stream/vegetation interface line and are established to a distance of 100 feet from each side of all intermittent and perennial streams as shown on the U.S. Geological Survey 7-1/2 minute topographic maps.

ii. Because the Huffs' Chumley Property is not within a riparian buffer zone, it is not subject to this restriction.

d. Finally, Zoning Ordiance Chapter 829-3 applies to all public, private and institutional land disturbing activities except "[l]ogging, mineral extraction, and agricultural uses." Zoning Ordiannce Chapter 829-3(A)(1). As a result, it clearly has no applicability to any logging on the Huffs' Chumley Property.

171. Even if the County wanted to require a logging permit and charge a license fee for such permit, Indiana law requires the County to adopt an ordinance "prescribing a specific manner for exercising the power." I.C. § 36-1-3-6(b)(1).

172. The County Code similarly provides that if there "is no constitutional or statutory provision requiring a specific manner for exercising a power, and Monroe County wants to exercise the power, Monroe County through its Board of Commissioners, shall adopt an ordinance prescribing a specific manner for exercising the power…" County Code Chapter 105-3(B)(1).

173.    There is no constitutional or statutory provision requiring a specific

manner for requiring a logging permit and charging a license fee for such permit.

Ignoring the requirements of state law and its own ordinance, the County has no

ordinance prescribing any manner, let alone a specific manner, for exercising a power to

impose logging permit and license fee requirements on land owners. Its failure to do so

means that it cannot even lawfully restrict logging activities in urban areas, let alone

non-urban, rural areas like the Huffs' Chumley Property.

174.    The license fee itself is unlawful because the amount of the fee is

determined solely by the location of his property. For example, if a landowner's

property is in the watershed of either Lake Griffy or Lake Monroe, the fee is twice as

much ($400) as any other permit ($200).

175.    Indiana law, however, prohibits the County from imposing a license fee

greater than that reasonably related to the administrative cost of exercising a regulatory

power. I.C. § 36-1-3-8(a)(6). The County's fee has no relation to the administrative cost

of reviewing applications for permits; instead, it is based solely upon the location of the

land. As a result, the County's permitting and fee scheme is unlawful.

## CAUSES OF ACTION

### Count 1
### 42 U.S.C. §1983
### Violation of Equal Protection Clause

176.    The Huffs reallege the preceding allegations as if fully alleged herein.

177.    The Defendants are "person[s]" under 42 U.S.C. § 1983.

178. As described more fully above, all of the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law, deprived the Huffs of equal protection of the laws.

179. The Defendants have intentionally treated the Huffs differently from others similarly situated.

180. There is no conceivable rational basis for the difference in treatment.

181. The Defendants' actions were motivated solely by personal dislike of the Huffs, personal animus for their plan to conduct logging operations on their property, and/or personal animus stemming from their decision to file counterclaims against the County.

182. As a result of this violation of their constitutional right to equal protection, the Huffs suffered injuries, including but not limited to curtailment of their right and ability to develop and enjoy their property, emotional distress, attorney fees, costs associated with their repeated applications, and the costs of this proceeding.

183. The misconduct described in this Count was undertaken pursuant to routine and widespread practice of the County, the Plan Commission, and the Planning Department to make it virtually impossible for the Huffs to develop the Huff Property as they wish to and as they are entitled to under State law and local ordinances. This practice is so permanent and well settled as to constitute a custom or usage.

184. In this way, the Defendants violated the Huffs' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

185.     The policies and practices described in this Count were maintained and implemented by the Defendants with deliberate indifference to the Huffs' constitutional rights.

186.     Some of the misconduct described in this Count was also the result of the acts of Larry Wilson, a person, prior to his retirement, with final policymaking authority for the Planning Department. Specifically, Wilson: (1) falsely told the Huffs that they were required to have a logging permit for any logging activity conducted anywhere on the Huff Property; (2) made false representations to the Huffs' contracted logger, causing the logger to refuse to undertake the project and the Huffs to sustain $7,500 in damages to terminate that contract; (3) worked to find any possible reason to deny the Huffs' application even though he admitted that there was "no real basis" for turning down a logging plan; (4) directed that a "stop work" order be wrongfully issued on the Huff Property without basis in law or fact; (5) falsely recounted a conversation with an IDEM storm water specialist in which Mr. Wilson claims the IDEM employee denied familiarity with the primary IDEM guidance and Rule governing her job; (6) scheduled a mid-lawsuit special BZA meeting in an attempt to get around his failure to follow statutory procedure prior to filing the lawsuit against the Huffs; and (7) provided false and unsupported information to the BZA regarding the purported effects of the Huffs' planned activities on the water.

187.     Some of the misconduct described in this Count was also the result of the acts of Jackie Nester Jelen, a person with final policymaking authority for the Planning Department. Specifically, Ms. Nester Jelen: (1) has repeatedly "stopped" the Huffs'

pending applications without authority or a valid reason to do so; (2) has made it virtually impossible for the Huffs to build their barn; (3) has refused to approve the Huffs' site plan for invalid reasons (for example, she claimed that the site plan was missing a required illustration even though the illustration was included with the application; she claimed that it was missing an architect's certification even though the site plan included the seal and signature of the Huffs' architect; she claimed the Huffs had to submit a SWPPP, which they are not required to do — but they had already done so anyway, etc.); (4) has insisted that the Huffs need a logging permit for the Chumley Property even though part of that property is in a rural area; and (5) has repeatedly directed the Huffs to contact the Building Department for a building permit even though Building Department employees have consistently told the Huffs that only the Planning Department can help them.

188.    As a direct and proximate result of the Defendants' actions, the Huffs' constitutional rights were violated and they suffered injuries and damages as alleged herein.

189.    The Defendants are therefore liable for the misconduct committed by their officers and employees.

190.    The Huffs are entitled to an award of attorney's fees.

### Count 2
### 42 U.S.C. § 1983
### Violation of Substantive Due Process Rights

191.    The Huffs reallege the preceding allegations as if fully alleged herein.

192.    The Defendants are "person[s]" under 42 U.S.C. § 1983.

193.    The Defendants' arbitrary and capricious behavior deprived the Huffs of their constitutionally-protected interest in the fair use and enjoyment of their private property.

194.    The Defendants' repeated delays, repeated demands for information that is not normally required, repeated refusals to provide information and clarification, and "stopping" of the Huffs' permit process were arbitrary, oppressive, and/or unreasonable.

195.    The Defendants' conduct with respect to the Huffs is so inexcusable that it shocks the conscience.

196.    The Defendants' conduct has deprived the Huffs of a protected interest in property or liberty, namely, the right to develop and use their real property as permitted under state law and local ordinance.

197.    The Huffs are without adequate state remedies to address the deprivation as the Defendants have been acting under the color of state law and local ordinance throughout their encounters with the Huffs.

198.    As a result of this violation of their constitutional right to substantive due process, the Huffs suffered injuries, including but not limited to curtailment of their right and ability to develop and enjoy their property, emotional distress, attorney fees, costs associated with their repeated applications, and the costs of this proceeding.

199.    The misconduct described in this Count was undertaken pursuant to routine and widespread practice of the County, the Plan Commission, and the Planning Department to make it virtually impossible for the Huffs to develop the Huff Property

as they wish to and as they are entitled to under State law and local ordinances. This practice is so permanent and well settled as to constitute a custom or usage.

200.    In this way, the Defendants violated the Huffs' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

201.    The policies and practices described in this Count were maintained and implemented by the Defendants with deliberate indifference to the Huffs' constitutional rights.

202.    Some of the misconduct described in this Count was also the result of the acts of Larry Wilson, a person, prior to his retirement, with final policymaking authority for the Planning Department. Specifically, Wilson: (1) falsely told the Huffs that they were required to have a logging permit for any logging activity conducted anywhere on the Huff Property; (2) made false representations to the Huffs' contracted logger, causing the logger to refuse to undertake the project and the Huffs to sustain $7,500 in damages to terminate that contract; (3) worked to find any possible reason to deny the Huffs' application even though he admitted that there was "no real basis" for turning down a logging plan; (4) directed that a "stop work" order be wrongfully issued on the Huff Property without basis in law or fact; (5) falsely recounted a conversation with an IDEM storm water specialist in which Mr. Wilson claims the IDEM employee denied familiarity with the primary IDEM guidance and Rule governing her job; (6) scheduled a mid-lawsuit special BZA meeting in an attempt to get around his failure to follow statutory procedure prior to filing the lawsuit against the Huffs; and (7) provided false

and unsupported information to the BZA regarding the purported effects of the Huffs' planned activities on the water.

203. Some of the misconduct described in this Count was also the result of the acts of Jackie Nester Jelen, a person with final policymaking authority for the Planning Department. Specifically, Ms. Nester Jelen: (1) has repeatedly "stopped" the Huffs' pending applications without authority or a valid reason to do so; (2) has made it virtually impossible for the Huffs to build their barn; (3) has refused to approve the Huffs' site plan for invalid reasons (for example, she claimed that the site plan was missing a required illustration even though the illustration was included with the application; she claimed that it was missing an architect's certification even though the site plan included the seal and signature of the Huffs' architect; she claimed the Huffs had to submit a SWPPP, which they are not required to do—but they had already done so anyway, etc.); (4) has insisted that the Huffs need a logging permit for the Chumley Property even though part of that property is in a rural area; and (5) has repeatedly directed the Huffs to contact the Building Department for a building permit even though Building Department employees have consistently told the Huffs that only the Planning Department can help them.

204. As a direct and proximate result of the Defendants' actions, the Huffs' constitutional rights were violated and they suffered injuries and damages as alleged herein.

205. The Defendants are therefore liable for the misconduct committed by their officers and employees.

206.    The Huffs are entitled to an award of attorney's fees.

**Count 3**
**42 U.S.C. § 1983**
**Violation of Procedural Due Process Rights**

207.    The Huffs reallege the preceding allegations as if fully alleged herein.

208.    The Defendants are "person[s]" under 42 U.S.C. § 1983.

209.    The Huffs have a constitutionally protected property interest in the use and enjoyment of their private property.

210.    The Defendants' unreasonable and overly burdensome regulation of the Huff Property has deprived the Huffs of their protected property interest without the due process of law.

211.    The Defendants have repeatedly "stopped" the Huffs' permitting process, putting them in a limbo that is not provided in any County ordinance, policy, or procedure. As a result, the Huffs have been deprived of their protected interest to use the real property that they own in a manner consistent with state law and local ordinance.

212.    The Defendants also continue to tell the Huffs that their applications are somehow lacking, but often refuse to provide clarification about what is missing or incorrect, simply telling the Huffs that "more" is needed.

213.    There are no procedural protections surrounding this deprivation. The Huffs have no recourse to "un-stop" their permitting process, as the stoppage itself is not officially permitted.

214.     The Huffs are without adequate state remedies to address the deprivation as the Defendants have been acting under the color of state law and local ordinance throughout their encounters with the Huffs.

215.     As a result of this violation of their constitutional right to procedural due process, the Huffs suffered injuries, including but not limited to curtailment of their right and ability to develop and enjoy their property, emotional distress, attorney fees, costs associated with their repeated applications, and the costs of this proceeding.

216.     The misconduct described in this Count was undertaken pursuant to routine and widespread practice of the County, the Plan Commission, and the Planning Department to make it virtually impossible for the Huffs to develop the Huff Property as they wish to and as they are entitled to under State law and local ordinances. This practice is so permanent and well settled as to constitute a custom or usage.

217.     In this way, the Defendants violated the Huffs' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

218.     The policies and practices described in this Count were maintained and implemented by the Defendants with deliberate indifference to the Huffs' constitutional rights.

219.     Some of the misconduct described in this Count was also the result of the acts of Larry Wilson, a person, prior to his retirement, with final policymaking authority for the Planning Department. Specifically, Wilson: (1) falsely told the Huffs that they were required to have a logging permit for any logging activity conducted anywhere on

49

the Huff Property; (2) made false representations to the Huffs' contracted logger, causing the logger to refuse to undertake the project and the Huffs to sustain $7,500 in damages to terminate that contract; (3) worked to find any possible reason to deny the Huffs' application even though he admitted that there was "no real basis" for turning down a logging plan; (4) directed that a "stop work" order be wrongfully issued on the Huff Property without basis in law or fact; (5) falsely recounted a conversation with an IDEM storm water specialist in which Mr. Wilson claims the IDEM employee denied familiarity with the primary IDEM guidance and Rule governing her job; (6) scheduled a mid-lawsuit special BZA meeting in an attempt to get around his failure to follow statutory procedure prior to filing the lawsuit against the Huffs; and (7) provided false and unsupported information to the BZA regarding the purported effects of the Huffs' planned activities on the water.

220.    Some of the misconduct described in this Count was also the result of the acts of Jackie Nester Jelen, a person with final policymaking authority for the Planning Department. Specifically, Ms. Nester Jelen: (1) has repeatedly "stopped" the Huffs' pending applications without authority or a valid reason to do so; (2) has made it virtually impossible for the Huffs to build their barn; (3) has refused to approve the Huffs' site plan for invalid reasons (for example, she claimed that the site plan was missing a required illustration even though the illustration was included with the application; she claimed that it was missing an architect's certification even though the site plan included the seal and signature of the Huffs' architect; she claimed the Huffs had to submit a SWPPP, which they are not required to do—but they had already done

50

so anyway, etc.); (4) has insisted that the Huffs need a logging permit for the Chumley Property even though part of that property is in a rural area; and (5) has repeatedly directed the Huffs to contact the Building Department for a building permit even though Building Department employees have consistently told the Huffs that only the Planning Department can help them.

221.     As a direct and proximate result of the Defendants' actions, the Huffs' constitutional rights were violated and they suffered injuries and damages as alleged herein.

222.     The Defendants are therefore liable for the misconduct committed by their officers and employees.

223.     The Huffs are entitled to an award of attorney's fees.

### Count 4
### 42 U.S.C. § 1983
### Retaliation for Exercise of First Amendment Rights

224.     The Huffs reallege the preceding allegations as if fully alleged herein.

225.     The Defendants are "person[s]" under 42 U.S.C. § 1983.

226.     The Huffs engaged in activity protected by the First Amendment, namely, appealing the trial court's injunction order in the litigation instituted by the Huffs' neighbors and filing counterclaims against the County and the Plan Commission in the litigation instituted by the County.

227.     The Huffs suffered a deprivation that would likely deter First Amendment activity in the future, namely, the delays and obstructions by the Defendants in the Huffs' desire to develop their Property.

228.    The Huffs' First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory actions.

229.    As a result of this violation of their constitutional right, the Huffs suffered injuries, including but not limited to curtailment of their right and ability to develop and enjoy their property, emotional distress, attorney fees, costs associated with their repeated applications, and the costs of this proceeding.

230.    The misconduct described in this Count was undertaken pursuant to routine and widespread practice of the County, the Plan Commission, and the Planning Department to make it virtually impossible for the Huffs to develop the Huff Property as they wish to and as they are entitled to under State law and local ordinances. This practice is so permanent and well settled as to constitute a custom or usage.

231.    In this way, the Defendants violated the Huffs' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

232.    The policies and practices described in this Count were maintained and implemented by the Defendants with deliberate indifference to the Huffs' constitutional rights.

233.    Some of the misconduct described in this Count was also the result of the acts of Larry Wilson, a person, prior to his retirement, with final policymaking authority for the Planning Department. Specifically, Wilson: (1) falsely told the Huffs that they were required to have a logging permit for any logging activity conducted anywhere on the Huff Property; (2) made false representations to the Huffs' contracted logger,

causing the logger to refuse to undertake the project and the Huffs to sustain $7,500 in damages to terminate that contract; (3) worked to find any possible reason to deny the Huffs' application even though he admitted that there was "no real basis" for turning down a logging plan; (4) directed that a "stop work" order be wrongfully issued on the Huff Property without basis in law or fact; (5) falsely recounted a conversation with an IDEM storm water specialist in which Mr. Wilson claims the IDEM employee denied familiarity with the primary IDEM guidance and Rule governing her job; (6) scheduled a mid-lawsuit special BZA meeting in an attempt to get around his failure to follow statutory procedure prior to filing the lawsuit against the Huffs; and (7) provided false and unsupported information to the BZA regarding the purported effects of the Huffs' planned activities on the water.

234.    Some of the misconduct described in this Count was also the result of the acts of Jackie Nester Jelen, a person with final policymaking authority for the Planning Department. Specifically, Ms. Nester Jelen: (1) has repeatedly "stopped" the Huffs' pending applications without authority or a valid reason to do so; (2) has made it virtually impossible for the Huffs to build their barn; (3) has refused to approve the Huffs' site plan for invalid reasons (for example, she claimed that the site plan was missing a required illustration even though the illustration was included with the application; she claimed that it was missing an architect's certification even though the site plan included the seal and signature of the Huffs' architect; she claimed the Huffs had to submit a SWPPP, which they are not required to do—but they had already done so anyway, etc.); (4) has insisted that the Huffs need a logging permit for the Chumley

Property even though part of that property is in a rural area; and (5) has repeatedly directed the Huffs to contact the Building Department for a building permit even though Building Department employees have consistently told the Huffs that only the Planning Department can help them.

235.     As a direct and proximate result of the Defendants' actions, the Huffs' constitutional rights were violated and they suffered injuries and damages as alleged herein.

236.     The Defendants are therefore liable for the misconduct committed by their officers and employees.

237.     The Huffs are entitled to an award of attorney's fees.

## Count 5
## 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

238.     The Huffs reallege the preceding allegations as if fully alleged herein.

239.     The Defendants are "person[s]" under 42 U.S.C. § 1983.

240.     The Defendants, acting in concert with one another as well as with the private citizens who live in The Shores, conspired by concerted action to accomplish an unlawful purpose (namely, preventing the Huffs from developing their property as they are entitled to do under local ordinance and State law) by unlawful means, as recounted more fully above.

241.     In furtherance of the conspiracy, each of the co-conspirators, through their employees and private citizens, committed overt acts as described in this Complaint and were otherwise willful participants in joint activity.

242. As a result of this conspiracy to violate their constitutional rights, the Huffs suffered injuries, including but not limited to curtailment of their right and ability to develop and enjoy their property, emotional distress, attorney fees, costs associated with their repeated applications, and the costs of this proceeding.

243. The misconduct described in this Count was undertaken pursuant to routine and widespread practice of the County, the Plan Commission, and the Planning Department to make it virtually impossible for the Huffs to develop the Huff Property as they wish to and as they are entitled to under State law and local ordinances. This practice is so permanent and well settled as to constitute a custom or usage.

244. In this way, the Defendants violated the Huffs' rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

245. The policies and practices described in this Count were maintained and implemented by the Defendants with deliberate indifference to the Huffs' constitutional rights.

246. Some of the misconduct described in this Count was also the result of the acts of Larry Wilson, a person, prior to his retirement, with final policymaking authority for the Planning Department. Specifically, Wilson: (1) falsely told the Huffs that they were required to have a logging permit for any logging activity conducted anywhere on the Huff Property; (2) made false representations to the Huffs' contracted logger, causing the logger to refuse to undertake the project and the Huffs to sustain $7,500 in damages to terminate that contract; (3) worked to find any possible reason to deny the

Huffs' application even though he admitted that there was "no real basis" for turning down a logging plan; (4) directed that a "stop work" order be wrongfully issued on the Huff Property without basis in law or fact; (5) falsely recounted a conversation with an IDEM storm water specialist in which Mr. Wilson claims the IDEM employee denied familiarity with the primary IDEM guidance and Rule governing her job; (6) scheduled a mid-lawsuit special BZA meeting in an attempt to get around his failure to follow statutory procedure prior to filing the lawsuit against the Huffs; and (7) provided false and unsupported information to the BZA regarding the purported effects of the Huffs' planned activities on the water.

247. Some of the misconduct described in this Count was also the result of the acts of Jackie Nester Jelen, a person with final policymaking authority for the Planning Department. Specifically, Ms. Nester Jelen: (1) has repeatedly "stopped" the Huffs' pending applications without authority or a valid reason to do so; (2) has made it virtually impossible for the Huffs to build their barn; (3) has refused to approve the Huffs' site plan for invalid reasons (for example, she claimed that the site plan was missing a required illustration even though the illustration was included with the application; she claimed that it was missing an architect's certification even though the site plan included the seal and signature of the Huffs' architect; she claimed the Huffs had to submit a SWPPP, which they are not required to do—but they had already done so anyway, etc.); (4) has insisted that the Huffs need a logging permit for the Chumley Property even though part of that property is in a rural area; and (5) has repeatedly directed the Huffs to contact the Building Department for a building permit even

though Building Department employees have consistently told the Huffs that only the Planning Department can help them.

248.     As a direct and proximate result of the Defendants' actions, the Huffs' constitutional rights were violated and they suffered injuries and damages as alleged herein.

249.     The Defendants are therefore liable for the misconduct committed by their officers and employees.

250.     The Huffs are entitled to an award of attorney's fees.

**Count 6**
**42 U.S.C. § 1983**
**Violation of the Fifth Amendment's Taking Clause**

251.     The Huffs reallege the preceding allegations as if fully alleged herein.

252.     The Defendants are "person[s]" under 42 U.S.C. § 1983.

253.     The County has not responded to "rural" area map provided by the Huffs in relation to the Huff's Chumley Property.

254.     The County's insistence, through Ms. Nester Jelen, requiring a logging permit for the entirety of the Huffs' Chumley Property is in direct contravention of Indiana Code § 36-7-4-1103.

255.     The County's actions deny the Huffs the complete use and alienation of forest located outside of the urban area.

256.     By mandating a logging permit for property in the rural area, the County has deprived the Huffs their constitutional rights, and results in a taking of the Huffs' Chumley Property without compensation.

257. The uncompensated seizure violates the Taking Clause of the Fifth Amendment, made applicable to States through the Fourteenth Amendment.

258. As a direct and proximate result of the Defendants' actions, the Huffs' constitutional rights were violated and they suffered injuries and damages as alleged herein.

259. The Defendants are therefore liable for the misconduct committed by their officers and employees.

260. The Huffs are entitled to an award of attorney's fees.

**Count 7**
**Zoning Ordinance Chapter 815 is unconstitutionally vague and overbroad on its face and Violates the 14th Amendment Due Process Clause**

261. The Huffs reallege the preceding allegations as if fully alleged herein.

262. Chapter 815 sets forth the site plan review process for Monroe County.

263. On April 19, 2022, the Plaintiffs submitted four (4) separate site plan applications (SIT-22-12, SIT 22-13, SIT-22-14, and SIT 22-15) (collectively hereinafter referred to as the "Site Plan Applications") related to the Huff Property despite maintaining they are not required to do so.

264. However, Zoning Ordinance Chapter 815-3 provides the Zoning Administrator unfettered discretion to deny a permit application and unbounded authority to condition the permit on any additional terms he or she deems "necessary and reasonable."

265.     Zoning Ordinance Chapter 815-3 is also subjective and vague in nature and confers overly broad discretion to the issuing authority that is insufficient to guide the County's permitting decisions.  For instance, 815-3(B) states:

> The Administrator shall consider and evaluate such application and associated site plan, and thereupon render a decision in writing, which decision shall consist of either:
>
> (1)   approval of the site plan based upon the determination that the proposed plan complies with the general, design and       performance standards set forth in this ordinance;
>
> (2)   Disapproval of the site plan based upon the determination that the proposed project does not meet the general, design or performance standards set forth in this ordinance; or
>
> (3)  Approval of the site plan subject to any conditions, modifications, and restrictions as required by the Administrator which will ensure that the project meets the general, design and performance standards set forth in this ordinance.

266.     In addition to being subjective, vague, and an abuse of authority, Zoning Ordinance Chapter 815 does not set forth any criteria for "stopping" a site plan application.

267.     Monroe County cited as a reason for its denials of the Site Plan Applications that Zoning Ordinance Chapter 815-4(D) requires site plans to comply with" any general standards provided in this ordinance."

268.     As the Monroe County Zoning Ordinance is several hundred pages in length, Zoning Ordinance Chapter 815-4(D) is susceptible to wide and varying differences of opinion.  It is not precise, definite and certain in expression so as to enable

the Huffs and the County to act with assurance and authority regarding the issuance of the site plan.

269. The site plan process under Zoning Ordinance Chapter 815-4(D) also substantively confers unbridled discretion on the County, and as such, the site plan review process set forth in Zoning Ordinance Chapter 815-4(d) should also be declared unconstitutionally vague as it does not provide fair warning as to what the governing body will consider in making a decision to approve or deny it.

**Count 8**
**42 U.S.C. § 1983**
**Violation of the Fifth Amendment's Taking Clause**

270. The Huffs reallege the preceding allegations as if fully alleged herein.

271. The Defendants are "person[s]" under 42 U.S.C. § 1983.

272. Even if Chapter 815 of the County's Zoning Ordinance is deemed to be constitutional, the manner in which the County is applying Zoning Ordinance Chapter 815 results in a taking of the Huffs' property.

273. In addition to being subjective, vague, and an abuse of authority, Zoning Ordinance Chapter 815 does not set forth any criteria for "stopping" a site plan application.

274. By first forcing a "stop" and subsequently issuing a "denial" of the Site Plan Applications, Monroe County has seized the Huff Property without compensation, and the seizure has resulted in all economically beneficial and profitable uses of the Huff Property being extinguished.

275.    By summarily denying the Site Plan Applications with reasons not based in fact or law, and refusing to extend constitutionally required just compensation to Plaintiffs, the actions of Monroe County in denying the Site Plan Applications jeopardize the Plaintiff's rights with respect to ownership of the Huff Property.

276.    By providing useless guidance such as the "site plan is missing 'more'", and "Chapter 815-4(D), for example, requires site plans must comply with 'any general standards provided in this ordinance'", the County creates a situation where approval for the Huffs to utilize their property for any reason, including permitted agricultural uses such as the construction of a barn, can be, and have been, unduly delayed and denied.

277.    The uncompensated seizure violates the Taking Clause of the Fifth Amendment, made applicable to States through the Fourteenth Amendment.

278.    As a direct and proximate result of the Defendants' actions, the Huffs' constitutional rights were violated and they suffered injuries and damages as alleged herein.

279.    The Defendants are therefore liable for the misconduct committed by their officers and employees.

280.    The Huffs are entitled to an award of attorney's fees.

## Count 9
## Declaratory Judgment Regarding Ordinance Retroactivity

281.    The Huffs reallege the preceding allegations as if fully alleged herein.

282.     The Huffs are persons who may obtain a declaratory judgment pursuant to Indiana Code § 34-14-1-2.

283.     The Huffs' rights, status, or other legal relations are potentially affected by the text amendment to Chapter 815. The Court may determine questions of construction or validity arising under the statute and provide a declaration of rights, status, or other legal relations thereunder. I.C. § 34-14-1-2.

284.     The new version of Zoning Ordinance Chapter 815 contains a new Site Plan Review Process. (Ex. 40, § 815-3.) But it does not contain a provision making the new review process, or anything else in the ordinance, retroactive in effect.

285.     The Huffs' application process began years ago. Many of their applications have been "stopped," rather than denied. And many of their applications that were denied, were denied wrongfully.

286.     The new version of Zoning Ordinance Chapter 815 should not be applied retroactively to any pending, "stopped," or already-denied applications for the Huff Property.

287.     As set forth above, the Site Plan Applications were impermissibly denied to circumvent the current requirements for a Site Plan Review under the former version of Zoning Ordinance Chapter 815.

288.     The Huffs have a right to have their Site Plan Applications considered in accordance with the laws in effect when the application is made, and should have the ability to survey the zoning laws as they exist at the time of application.

289.     The Huffs are entitled to an award of attorney's fees.

**Count 10**
**Declaratory Judgment Regarding Chumley Property**

290.     The Huffs reallege the preceding allegations as if fully alleged herein.

291.     As set forth above, the Site Plan Applications were impermissibly denied to circumvent the current requirements for a Site Plan Review under the current version of Chapter 815.

292.     This Court has the power to declare the rights, status and other legal relations of the Huffs and the County pursuant to Ind. Code §34-14-1-1.

293.     An actual controversy exists as to the rights, status and legal relations of the Huffs and the County.

294.     The Huffs' rights, status, or other legal relations are affected by I.C. § 36-7-4-1103(b) and the Huffs may have the Court determine any question of construction or validity arising under the statute and obtain a declaration of rights, status, or other legal relations thereunder. I.C. § 34-14-1-2.

295.     The Chumley Property is not an "urban area" as defined by state law or the Monroe County Code. Nevertheless, the Defendants have repeatedly required the Huffs to apply for a logging permit and pay an associated license fee before performing any logging on the Chumley Property.

296.     None of the "Useful Code References" on the Logging Permit Checklist apply to the Chumley Property.

297.     There is no constitutional or statutory provision requiring a specific manner for requiring a logging permit and charging a license fee. Therefore, the County

is required to adopt an ordinance prescribing a specific manner for exercising a power to impose logging permit and license fee requirements. There is no such ordinance.

298.     The license fee is determined solely by the location of the property and is not reasonably related to the administrative cost of reviewing applications for permits.

299.     The Huffs are entitled to an award of attorney's fees.

## COUNT 11
### Chapter 815 of the Monroe County Zoning Ordinance  is unconstitutionally overbroad under Indiana law

300.     The Huffs reallege the preceding allegations as if fully alleged herein.

301.     Chapter 815  fails to set forth concrete standards by which approval  for the Site Plan Applications may be granted.

302.     The manner in which the Site Plan Applications are to be approved is not sufficiently circumscribed and Chapter 815 does not give applicants such as the Huffs fair warning on its application.

303.     As set forth above the Monroe County Zoning Ordinance is several hundred pages in length, Ordinance 815-4(D) is susceptible to wide and varying differences of opinion.  It is not precise, definite and certain in expression so as to enable the Huff's and the County to act with assurance and authority regarding the issuance of the site plan.

304.     The site plan process under Chapter 815-4(D) also substantively confers unbridled discretion on the County, and as such, the site plan review process  set forth in Chapter 815-4(d) should also be declared unconstitutionally overbroad as it is not drawn in sufficiently narrow terms and prohibits legitimate conduct by the Huffs.

305. For the reasons set forth above, Chapter 815 of the Monroe County Zoning Ordinance should be declared void.

## Prayer for Relief

WHEREFORE, the Huffs respectfully request that the Court:

A. Enter judgment in favor of the Huffs and against the Defendants;

B. Order the Defendants to pay compensatory damages in an amount to be determined at a trial of this matter;

C. Order any equitable relief that may be proper;

D. Declare that the new version of Zoning Ordinance Chapter 815 does not apply retroactively to any pending, or already denied, applications for the Huff Property;

E. Declare the actions of the Defendants unconstitutional under the United States Constitution;

F. Declare Zoning Ordinance Chapter 815 unconstitutional;

G. Order the Defendants to pay just compensation for their unconstitutional taking;

H. Declare that:

    a. The Huffs' Chumley Property is not "urban" under I.C. § 36-7-4-1103(b).

    b. The Huffs' Chumley Property is not located in "Urban Areas" under Zoning Ordinance Chapter 801-2.

c. The County has violated I.C. § 36-7-4-1103(a) by preventing the Huffs from having the complete use of the forests on the Huffs' Chumley Property.

d. Zoning Ordinance Chapter 825-3(B)(1)(b) is unlawful because it prevents the Huffs' complete use of the forests on the Huffs' Chumley Property.

e. The County has no legal right to restrict, in any manner, the Huffs' use of its forest on the Huffs' Chumley Property.

f. The County has no legal right to require a logging permit or to charge a fee for any logging activities on the Huffs' Chumley Property or any other non-urban area.

g. The County violated I.C. § 36-1-3-6(b)(1) by imposing permitting restrictions and charging a license fee without enacting an ordinance prescribing a specific manner for exercising the power to require a permit or charge a license fee.

h. The County's license fee itself is unlawful because it is greater than that reasonably related to the administrative cost of exercising a regulatory power. I.C. § 36-1-3-8(a)(6).

i. Zoning Ordinance Chapters 816-2, 816-4(E)(2), 825-3, and 829-3 are not applicable to the Huffs' Chumley Property; and

I. Grant such other relief as may be proper.

## DEMAND FOR JURY TRIAL

The Huffs, by counsel, respectfully request a jury trial for all issues deemed so triable.

DATED:  May 10, 2022      Respectfully submitted,

*/s/ Chou-il Lee*
Chou-il Lee, #21183-53
Blake J. Burgan, # 18350-49
Nadine E. McSpadden, #25420-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
Phone: 317.713.3500
Fax: 317.713.3699
clee@taftlaw.com
bburgan@taftlaw.com
nmcspadden@taftlaw.com