**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| WILLIAM J. HUFF, II, as Trustee of the William J. Huff, II, Revocable Trust Declaration, Dated June 28, 2011, and NICOLE E. HUFF, as Trustee of the Nicole E. Huff Revocable Trust Declaration, Dated June 28, 2011, | Civil Action No. 1:22-cv-00812-JPH-TAB |
| *Plaintiffs,* | |
| v. | |
| MONROE COUNTY, THE MONROE COUNTY PLAN COMMISSION, and THE MONROE COUNTY PLANNING DEPARTMENT, | |
| *Defendants.* | |

# PLAINTIFFS' RESPONSE TO
# <u>MOTION TO DISMISS</u>

Blake J. Burgan, # 18350-49
Chou-il Lee, #21183-53
Nadine E. McSpadden, #25420-49
Jeffrey W. Parker, Jr., #35742-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
Phone: 317.713.3500
Fax: 317.713.3699
bburgan@taftlaw.com
clee@taftlaw.com
nmcspadden@taftlaw.com
jparker@taftlaw.com

# TABLE OF CONTENTS

Factual Background ........................................................................................................... 1

    Before: 2017–2020 ...................................................................................................... 1

    After: March 2021–Present ....................................................................................... 3

Legal Standard ................................................................................................................. 6

Argument ......................................................................................................................... 6

  1. The Court should not abstain from exercising jurisdiction over this case because the State Action has all but concluded ...................................................................... 6

    1.1 *Younger* abstention is improper because adjudication of the Huffs' federal claims will not interfere with the state court's enforcement of the final Settlement Agreement ........................................................................................ 7

       1.1.1 Even if the *Younger* doctrine applies, the bad faith exception removes this case from its orbit. ................................................................................. 11

    1.2 *Colorado River* abstention is improper because the state and federal actions are not parallel and because the majority of factors favor retention of jurisdiction .................................................................................................... 13

    1.3 Catch-all abstention is improper because all that's left in the state court is enforcement of the final Settlement Agreement ........................................... 17

    1.4 If abstention is proper, the federal action should be stayed, not dismissed ................................................................................................... 17

  2. The equal protection claim (Count 1) should not be dismissed because the Huffs sufficiently allege they were treated differently than similarly situated landowners and there is no rational basis for the County's actions ..................... 18

    2.1 The Huffs have satisfied their pleadings-stage burden of alleging they were treated differently than similarly situated individuals. ................................. 18

    2.2 The County had no rational basis for its actions. ........................................... 19

    2.3 The County's actions were based on personal animus against the Huffs. ... 20

  3. The procedural due process (Count 3) and vagueness (Count 4) claims should not be dismissed because the Huffs' allegations are sufficient to state a claim .. 21

  4. The takings claim (Count 6) should not be dismissed because it is ripe and properly pleaded ........................................................................................................ 24

  5. The substantive due process claim (Count 2) should not be dismissed because the Huffs have alleged multiple viable claims under federal law and there is no rational basis for the County's actions .................................................................... 26

  6. Because the Huffs' federal claims survive dismissal, this Court should retain supplemental jurisdiction over their state law claims (Counts 5 and 7) .............. 27

# TABLE OF AUTHORITIES

## Cases

*A.T. v. Cnty. of Cook*, 613 F. Supp. 775 (N.D. Ill. 1985) ............................................................ 11

*AAR, Int'l, Inc. v. Nimelisa Enters. S.A.*, 250 F.3d 510 (7th Cir. 2001) ................................ 13

*Adkins v. VIM Recycling, Inc.*, 644 F.3d 483 (7th Cir. 2011) .................................................. 17

*Ashley W. v. Holcomb*, 34 F. 4th 588 (7th Cir. 2022) ............................................................ 11

*Capra v. Cook Cnty. Bd. of Rev.*, 733 F.3d 705 (7th Cir. 2013) ......................................... 18, 19

*Colo. River Water Conservation Dist. v. U.S.*, 424 U.S. 800 (1976) ............................... 6, 13, 17

*D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681 (7th Cir. 2013) .................................................. 19

*Doherty v. City of Chicago*, 75 F.3d 318 (7th Cir. 1996) ....................................................... 26

*Engquist v. Or. Dep't of Agric.*, 553 U.S. 591 (2008) ............................................................ 18

*Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013 (7th Cir. 2014) ........................... 15, 16

*Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012) ................................................ 18, 19

*Giaccio v. Pennsylvania*, 382 U.S. 399 (1966) ..................................................................... 21

*Hendricks Cnty. Bd. of Comm'rs v. Rieth-Riley Constr. Co.*,
   868 N.E.2d 844 (Ind. Ct. App. 2007) ............................................................................... 22

*J.B. v. Woodard*, 997 F.3d 714 (7th Cir. 2021) ............................................................. 7, 8, 17

*John C. & Maureen G. Osborne Revocable Fam. Tr. v. Town of Long Beach*,
   No. 3:17-CV-227 JD, 2018 WL 1471903 (N.D. Ind. Mar. 26, 2018) ................................. 19

*Loughran v. Wells Fargo Bank, N.A.*, 2 F.4th 640 (7th Cir. 2021) ........................................ 16

*Lunini v. Grayeb*, 395 F.3d 761 (7th Cir. 2005) ................................................................... 20

*McDonald v. Village of Winnetka*, 371 F.3d 992 (7th Cir. 2004) ............................................ 18

*Milchtein v. Chisholm*, 880 F.3d 895 (7th Cir. 2018) .............................................................. 7

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) ....................... 13, 15

*Mulholland v. Marion Cnty. Election Bd.*, 746 F.3d 811 (7th Cir. 2014) .................................. 6

*New Albany DVD, LLC v. City of New Albany*, 350 F. Supp. 2d 789
   (S.D. Ind. 2004) .................................................................................................... 6, 11, 12

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*,
   491 U.S. 350 (1989) .......................................................................................................... 6

*Pakdel v. City and Cnty. of San Francisco*, 141 S. Ct. 2226 (2021) ................................. 24, 25

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) ................................................................. 25

iii

*Stewart v. W. Heritage Ins. Co.*, 438 F.3d 488 (5th Cir. 2006) ................................................... 15

*Sverdrup Corp. v. Edwardsville Cmty. Unit Sch. Dist. No. 7*,
   125 F.3d 546 (7th Cir. 1997) ..................................................................................... 6

*T.T. Thom Constr., Inc. v. City of Jeffersonville*,
   721 N.E.2d 319 (Ind. Ct. App. 1999) ....................................................................... 21

*The Kroger Co. v. Plan Comm'n*, 953 N.E.2d 536 (Ind. Ct. App. 2011) ................................. 21

*Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*,
   473 U.S. 172 (1985) ................................................................................................... 24

**Other Authorities**

Monroe Cnty. Zoning Ord. Ch. 815-3 .................................................................................... 22

In this story, there is a before and an after. The "before" includes events preceding the parties' litigation in state court. The state court proceedings resolved with a settlement agreement, and the only issue remaining in the state court is enforcement of that agreement. The "after" includes everything that has happened since the parties entered into the settlement agreement. While the County's appalling treatment of the Huffs is an unfortunate through-line, its new actions are unrelated to what happened before, and the Huffs have a right to litigate their claims based on the County's new actions in this forum. And on the merits of each individual claim, the Huffs have raised sufficient allegations at the pleadings stage to survive a motion to dismiss. Thus, the Huffs respectfully ask that this Court deny the County's Motion to Dismiss.

## FACTUAL BACKGROUND

### Before: 2017–2020

The Huffs own nearly 250 acres of real property in Monroe County. (Dkt. 45, at ¶ 15.) In 2017, the Huffs began preparing to conduct logging activities on their property. (*Id.*, ¶19.) The County did everything in its power (and some things that were not within its power) to block the Huffs' logging efforts. (*Id.*, ¶¶ 20–21, 25–42.) Although the Huffs complied with all requirements every step of the way, the County did not approve their logging permit application. (*Id.*, ¶ 42.) They submitted a second logging permit application that the County continued to slow walk, offering improper and incorrect excuses. (*Id.*, ¶ 50–52.) Meanwhile, in April 2018, neighbors of the Huffs' property filed a lawsuit seeking to prohibit logging activity. (*Id.*, ¶ 53.) That case ended up with the Court of Appeals, which found that the grant of easement did not preclude the Huffs from conducting logging activities. (*Id.*, ¶¶ 55–57.)

The Huffs continued to try to develop their property, developing plans to build structures for agricultural purposes, including a gazebo (providing a safe and sheltered place for agricultural workers to eat), a pavilion (keeping the straw dry that the Huffs used in

the harvesting activities), and a shed (used to store equipment, gas, oil, grass seed, and tools). (*Id.*, ¶ 63–64.) The County incorrectly told the Huffs that they had to obtain an improvement location permit and site plan approval prior to placing any structures on the property. (*Id.*, ¶ 58–62.)

On May 16, 2019, the County sued the Huffs, alleging that the Huffs had violated ordinances and building code provisions and seeking declaratory and injunctive relief. (*Id.*, ¶ 66.) The Huffs counterclaimed for defamation per se, defamation per quod, invasion of privacy (false light), and violation of substantive and procedural due process rights under Section 1983. (*Id.*) Notably, while in its Motion to Dismiss the County hales the Board of Zoning Appeals ("BZA") as the arbiter of last resort with which the Huffs should have sought relief, the County did not seek BZA approval before filing the lawsuit. (*Id.*, ¶¶ 78–86.) Months later, the County held a special meeting, held in a different location than normal and barely advertised publicly, after which the BZA retroactively approved the lawsuit based on incomplete, if not outright false, information provided by the County. (*Id.*, ¶¶ 87–97.)

On October 12, 2020, the parties participated in mediation and reached an agreement (the Settlement Agreement). (*Id.*, ¶¶ 98–99; Dkt. 45, Ex. 26.) The state court later determined that the effective date of the Settlement Agreement was October 14, 2020, the date on which the County Commissioners ratified the agreement terms.

After reaching the Settlement Agreement, the parties have continued to litigate—but *only* issues specifically related to and stemming from the Settlement Agreement. For example, the parties disagreed about the effective date, which the state court later resolved. Most recently (and conveniently, for the County), after the First Amended Complaint in this action was filed and served by the Huffs, on June 29, 2022, the County decided to file a Motion to Enforce Settlement Agreement in the state court action—on which they now rely in their quest for abstention. The Motion to Enforce Settlement Agreement, which

has no bearing on the Huffs' claim in this lawsuit, has been briefed and argued and is awaiting ruling. Nothing else remains as a live issue in the state court action.

### *After: March 2021–Present*

**The Barn and the Gate.** Since March 2021, the Huffs have been jumping through hoops to try to build a barn and a gate. (Dkt. 45, ¶¶ 105–06.) The Huffs applied for a variance related to the planned height of the barn. Jacqueline Nester Jelen, Director of the Planning Department, demanded a new site plan and "stopped" the variance application. (*Id.*, ¶ 107.) The Huffs applied for a Use Determination for the barn, explaining that the use would be agricultural; Ms. Nester Jelen responded with multiple questions, to which the Huffs responded; she eventually told the Huffs to apply for a building construction permit. (*Id.*, ¶¶ 109–110.) The Huffs complied with her directive, only to be told by the Building Department that they could take no action until the Planning Department provided a site plan approval. (*Id.*, ¶¶ 111–12.) In April 2022, the Huffs again submitted an application with the Building Department, who again stated that they needed to contact the Planning Department. (*Id.*, ¶ 113.)

Ms. Nester Jelen reentered the conversation, coming up with new questions and "deficiencies" in the Huffs' site plan, and "stopped" their application. (*Id.*, ¶ 114.) Whereas before she directed the Huffs to the Building Department as a step one before obtaining site plan approval, she now changed tack, directing the Huffs to seek approval from "the Highway and Planning Departments ahead of filing for a building permit[.]" (*Id.*, ¶ 115.) Mr. Huff responded with multiple questions to which Ms. Nester Jelen has never responded. (*Id.*, ¶ 116.)

The parties met on April 9, 2021. (*Id.*, ¶ 120.) At that meeting, the Huffs presented a new site plan. (*Id.*) The County has offered ever-changing reasons for its refusal to approve the site plan. (*Id.*) The County represented at that meeting that the proposed barn would be considered agricultural and that the delays would cease, but in the year and a

half since, the Huffs have not been permitted to proceed with their barn or their gate. (*Id.*, ¶¶ 121–124.)

**The Residences.** On March 3, 2021, the Huffs applied for an Improvement Location Permit. (*Id.*, ¶ 125.) The application was "stopped" for various reasons, including incorrect ones such as requiring the Huffs to show the location of septic systems on the property where no septic systems are located. (*Id.*, ¶¶ 125–26.)

Also on March 3, 2021, the Huffs submitted an application for a "Pre-Design" for their planned residences. (*Id.*, ¶ 127.) Ms. Nester Jelen responded by stating that 3 structures could not be located on 1 legal lot of record. (*Id.*) Mr. Huff asked for the code citation supporting that; Ms. Nester Jelen never provided it and did not respond again until March 31, 2021. (*Id.*, ¶¶ 128–29.)

On March 25, 2022, the Huffs submitted an application for a pre-design or pre-filing meeting for the planned home sites. Ms. Nester Jelen "stopped the application," instructing the Huffs to file a site plan and seek building permits. (*Id.*, ¶ 130.) The Huffs and the Building Department were engaged in an ongoing conversation until May 4, 2022, when Misty Deckard of the Building Department told the Huffs, with no explanation, that "this project is on hold" and that they needed to "contact County Planning with any questions." (*Id.*, ¶¶ 131–34.)

**Septic.** Between March and September 2021, the Huffs submitted six applications for septic permits. (*Id.*, ¶ 135.) The County determined that a flood plain review was necessary even though the property is not in a flood plain. (*Id.*, ¶ 136.) But not until December 16, 2021, were the applications under the "Floodplain Review step" with the Planning Department. (*Id.*, ¶ 138.) On January 10, 2022, the County approved three of the applications. (*Id.*) On February 10, 2022, Mr. Huff communicated his frustration, and the next day, the County approved the three remaining applications. (*Id.* at ¶ 139.) The County failed to rule on any of the six applications within the forty-five-day timeframe required by 410 IAC 6-8.3-53(g).

**Grading Permit.** On April 21, 2022, the Huffs submitted an application for a Grading Permit. (*Id.*, ¶ 141.) Ms. Nester Jelen responded, telling them in part that they were "in need of a full Stormwater Pollution Prevention Plan (SWPPP) for review." (*Id.*, ¶ 142.) The Huffs submitted a Stormwater Inquiry form and were directed back to the Planning Department. (*Id.*, ¶ 144.) The application was then "stopped" without explanation. (*Id.*, ¶ 145.)

**April 2022 Site Plan Stoppages.** On April 19, 2022, the Huffs submitted four site plan applications. (*Id.*, ¶ 146.) Ms. Nester Jelen responded that the Site Plan Applications had been denied and/or "stopped." (*Id.*, ¶¶ 147, 149.) The reasons articulated by Ms. Nester Jelen for the denials and/or stoppages are without basis in fact or law—and some are simply false. (*Id.*, ¶¶ 149–52 and accompanying tables.)

**No One Else Has Been Treated This Way.** Stephen Smith is a retired Indiana professional engineer and land surveyor with substantial experience in planning and zoning. (*Id.*, ¶ 161.) Smith began working with the Huffs in 2016. (*Id.*, ¶ 162.) Over the course of his forty-year career, Smith has never been involved with a property owner in Monroe County that has been treated the way the Huffs have been. (*Id.*, ¶ 163.) Before the Huffs, the Planning Department was never involved in the septic permitting process. (*Id.*, ¶ 167.) And Smith has observed a continuing pattern of new rules, requirements, and denials imposed on the Huffs' property that he has never seen before on any other project. (*Id.*, ¶ 169.)

Smith has never seen so many applications being "stopped" for no reason. (*Id.*, ¶ 170.) Since the Planning Department began "stopping" applications in 2021, Smith Design Group has submitted 112 separate applications—of those, 28 have been stopped. Of those 28, 6 were stopped by the owner or because of an error; the remaining 22—the *only* stoppages enacted by the County—belong to the Huffs. (*Id.*, ¶ 171.) In forty years, the Huffs are the only property owners who have been treated this way by the County. (*Id.*, ¶ 172.)

The Huffs now bring these new federal and state claims against the County, based on new acts that occurred after the parties entered into the Settlement Agreement.

## LEGAL STANDARD

The Huffs agree with the legal standard as set forth by the County.

## ARGUMENT

**1. The Court should not abstain from exercising jurisdiction over this case because the State Action has all but concluded.**

The County makes it sound as though abstention is a common, everyday occurrence—as though it is the fallback, default position. But this is wrong: "As a general rule, federal courts will not abstain from deciding cases within their jurisdiction." *New Albany DVD, LLC v. City of New Albany*, 350 F. Supp. 2d 789, 791 (S.D. Ind. 2004) (citing *Colo. River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817–18 (1976)); *see also Mulholland v. Marion Cnty. Election Bd.*, 746 F.3d 811, 815 (7th Cir. 2014) ("The abstention doctrine set forth in *Younger v. Harris*, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971) is an exception to the general rule that federal courts must hear and decide cases within their jurisdiction."); *Sverdrup Corp. v. Edwardsville Cmty. Unit Sch. Dist. No. 7*, 125 F.3d 546, 549–50 (7th Cir. 1997) ("the presumption is against abstention") (cleaned up). In fact, federal courts have a "virtually unflagging obligation…to exercise the jurisdiction given them." *Colo. River*, 424 U.S. at 817. This duty arises from the "undisputed constitutional principle that Congress, and not the judiciary, defines the scope of federal jurisdiction within the constitutionally permissible bounds." *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 359 (1989).

Thus, the mere "pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colo. River*, 424 U.S. at 817 (cleaned up). Only in "extraordinary and narrow" circumstances may a district court

decline or abstain from exercising its jurisdiction in favor of state court litigation. *Id.* at 813 (noting that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule"). As will be seen below, this case does not present an "extraordinary and narrow" circumstance supporting the County's request for abstention.

### 1.1 *Younger* abstention is improper because adjudication of the Huffs' federal claims will not interfere with the state court's enforcement of the final Settlement Agreement.

The *Younger* abstention doctrine "directs federal courts to abstain from exercising jurisdiction over federal claims that seek to interfere with pending state court proceedings." *J.B. v. Woodard*, 997 F.3d 714, 722 (7th Cir. 2021). The doctrine applies, in relevant part, where "federal court intervention would intrude…into state-initiated civil enforcement proceedings akin to criminal prosecutions[.]" *Id.*

*Woodard*, on which the County relies, offers a useful comparison, highlighting both why the instant proceedings do not involve a "pending" state court proceeding and why in this case (unlike in *Woodard*), the federal proceeding will not intrude or interfere with the state court action.[1] In *Woodard*, the case began as a divorce and child custody dispute in state court. *Id.* at 717. The father's then-wife successfully sought a court order suspending the father's parenting time. *Id.* at 718. While the custody dispute was still pending and the father's appeal of the suspension of parenting time order was also still pending, the father filed a complaint in federal court. *Id.* at 721 ("When Edwin filed his federal complaint in June 2019, the state court proceedings were ongoing, and the facts underpinning his loss of parenting time in state court are the same alleged facts he relies on to

---

1   The County also cites to *Milchtein v. Chisholm* in support of its abstention argument. 880 F.3d 895 (7th Cir. 2018). But while the *Milchtein* Court discussed general abstention principles, it did not make a substantive ruling on the abstention issue. It found that the case was moot, merely observing that "the Milchteins' proposed means of rescuing this case from mootness runs smack into *Younger*," without actually deciding whether or not to abstain. *Id.* at 899. Therefore, the substance of *Milchtein* is not relevant here.

support his due process claims."). Indeed, the Seventh Circuit observed that the father sought "federal court intervention to resolve essentially the same dispute that remains pending on the state court's docket. Right to it, Edwin's complaint leaves us with the clear and unmistakable impression that he seeks a favorable federal court judgment so that he can use that judgment to influence ongoing state court decision making." *Id.*

Ultimately, the Seventh Circuit concluded that the father could not "compel the adjudication of claims that would inject a federal court into a contested and ongoing family court custody dispute. Yet that is precisely what is going on." *Id.* at 722. The Court found that the father's federal complaint was designed "to receive a favorable federal constitutional ruling that can be used affirmatively or offensively to shape—or perhaps change—the direction and course of the state court proceedings." *Id.* at 723. Therefore, the adjudication of his due process claims "threaten interference with and disruption of local family law proceedings—a robust area of law traditionally reserved for state and local government—to such a degree as to all but compel the federal judiciary to stand down." *Id.*

The circumstances in this case are dramatically different from those in *Woodard*. First, it is arguable as to whether the state court action is even still "pending." The parties reached a full Settlement Agreement that will resolve the entire lawsuit. The only issues still being litigated are specifically related to the terms of the Settlement Agreement. For all intents and purposes, the substantive piece of the state court litigation is *done*. While the County asserts that the Huffs could bring their new state and federal claims in the state court action, it is all but certain that if the Huffs actually tried to do that, the County would strenuously object. It is arguably too late in the state court action to amend the complaint, and given that the parties have reached a full Settlement Agreement, to add new claims would be to derail the agreement everyone worked so hard to achieve.

Even if the state court action could be considered to be "pending," the new federal action will not interfere with or intrude on the state court proceeding. The factual allegations underlying the Huffs' federal complaint are *new* things that have occurred *since* the

Parties executed the Settlement Agreement . And none of the allegations here overlap in any way with the terms of the Settlement Agreement.

| Settlement Agreement Term | Relevance to Federal Complaint? |
|---|---|
| 1. The County will take no further action on **past activities** on the part of the property deemed agricultural. | None, because this provision relates to "past activities," while the federal complaint is based only on events that have occurred since the execution of the Settlement Agreement. |
| 2. Terry Quillman and an engineer from Smith will engage in a joint assessment of the current status of **erosion control** on the property as the result of Huff activities… | None. "Erosion control" is not at issue in the federal complaint. |
| 3. The Director of Planning will **delegate all such duties** with respect to the Huffs' property except as such duties are non-delegable duties under Indiana law. | None. |
| 4. To determine the urban area of the Huffs' property, Chou-il Lee will produce a map and the parties will work towards an agreement. Once the parties agree, the Huffs will seek a variance through communication with the Assistant Director.[2] | None. The "urban versus rural" issue is not a basis of any of the Huffs' federal claims. |
| 5. The County will not have any extraordinary communications with IDEM, DNR or the Corps of Engineers. Extraordinary communication is defined as initiating any communications with those agencies unless statutorily or ordinance required. | None. |
| 6. The County agrees not to advocate any adverse positions with IDEM, DNR or the | None. The "facts of the current litigation" in the state court action are not at issue |

---

[2]    The precise wording of this term remains to be decided by the Monroe County trial court. But regardless of which party's version wins the day, Provision 4 is not relevant to the federal proceedings.

| | |
|---|---|
| Corps of Engineers concerning the facts of the current litigation. | here because the Huffs' federal claims are based on facts that developed after the Settlement Agreement was executed. |
| 7. The Huffs agree that prior to beginning any residential, commercial, or non-agricultural construction, the Huffs will seek the necessary permits. | None — but this provision bears further analysis, set forth below. |
| 8. The County will make a statement to the media that the Huffs did not harm Lake Monroe. | None. |
| 9. The Huffs will direct their counsel to dismiss the Counterclaims. | None. |
| 10. The County will dismiss its lawsuit against the Huffs. | None. |
| 11. The parties agree that any disputes arising from the application or enforcement of this settlement or the underlying facts will be resolved by mediation. | None, because the federal complaint is based on new actions, not on "disputes arising from the application or enforcement of this settlement or the underlying facts[.]" |
| 12. The County will tender to the Huffs, $50,000.00 — of that $25,000 will be paid by OneBeacon Insurance. David will speak with Commissioners. | None. |
| 13. Parties will execute Mutual General Releases which will include all claims vs. the Huffs and Huffs will include release of all Monroe County officials, agents and employees. The releases will not include any admissions of liability. | None. |

(Dkt. 45, Ex. 26.)

The Huffs expect that the County will argue that the federal action intrudes on Provision 7 of the Settlement Agreement, but the County will be wrong. Provision 7 provides that "[t]he Huffs agree that prior to beginning any residential, commercial, or non-agricultural construction, the Huffs will seek the necessary permits." (*Id.*) It is undeniably

true that the post-2020 permitting process is a central part of the Second Amended Complaint. But what is at issue in the Huffs' claims is *the County's behavior* in the permitting process. Provision 7 requires that *the Huffs* seek the necessary permits (which they have undisputedly done), and the County could seek, and has sought, to enforce this provision against the Huffs. But this provision does not require anything from the County. The Huffs have no redress under the Settlement Agreement to force the County to cooperate with the permitting process.

Nothing the federal action will decide will have any bearing on the remaining limited issues before the state court. There is no potential for interference or intrusion. Thus, this case is not one of the very limited exceptions to the general rule that federal courts should exercise the jurisdiction afforded by Congress, the *Younger* doctrine does not apply, and abstention is unwarranted. *See A.T. v. Cnty. of Cook*, 613 F. Supp. 775, 778 (N.D. Ill. 1985) (*Younger* abstention improper where "this case affects nothing in that state court proceeding," plaintiffs do not "seek to enjoin or delay those proceedings or interfere with any state decision on the merits," and "[f]ederal intervention will not duplicate state proceedings, disrupt the state court determination on the merits or insult the competence of the state courts"); *cf. Ashley W. v. Holcomb*, 34 F. 4th 588, 594 (7th Cir. 2022) (abstention proper where "the live contentions in this litigation all may be resolved by judges in CHINS proceedings").

### 1.1.1 Even if the *Younger* doctrine applies, the bad faith exception removes this case from its orbit.

In its Motion to Dismiss, the County neglects to mention that even if the *Younger* doctrine applies, there are exceptions: "The fourth and final element of the [*Younger*] abstention analysis is to determine whether any extraordinary circumstance exists that would weigh against abstention." *New Albany DVD*, 350 F. Supp. 2d at 795. Relevant here is the exception providing that abstention is not warranted if "there is evidence of state proceedings motivated by bad faith[.]" *Id.*

The *New Albany DVD* case is instructive. In that case, New Albany DVD ("DVD"), a business that sold adult materials, sought a remodeling permit. *Id.* The permitting process proceeded normally "until the day the word got out that its business was to sell adult materials. Then, the normal permit-issuing process came to a halt[.]" *Id.* Much as in this case, the City put every obstacle it could create in the path of DVD's permitting process. *Id.* at 795–96. Shortly after DVD filed a federal complaint, the City filed a declaratory action in state court, which the Court found to be "a suspicious interval[.]" *Id.* at 796. The Court also noted that in the interim, the City passed an ordinance, "the enforcement of which would have prevented DVD from lawfully opening their business" even if the permitting process problems were solved. *Id.* Ultimately, the Court found that "[t]hese circumstances are susceptible to an inference of bad faith prosecution on the part of the City, which inference, together with our view that the first element of the *Younger* doctrine has not been fully satisfied, leads us to conclude that abstention in the federal lawsuit is not appropriate." *Id.*

Here, as in *New Albany DVD*, the Huffs' permitting process has been rife with obstacles, delays, and unexplained stoppages. Here, as in *New Albany DVD*, no one else in Monroe County has ever been treated this way by the County, showing that the County has specifically targeted the Huffs. Here, as in *New Albany DVD*, the County passed an ordinance in the middle of its battle with the Huffs, seeking to curtail the Huffs' ability to develop their property as they were otherwise entitled to do. And here, as in *New Albany DVD*, the County tried to use state court procedure to its advantage, filing the Motion to Enforce Settlement Agreement after the Huffs filed the federal complaint, and then using the existence of that Motion in state court to advocate for abstention in this one.

As in *New Albany DVD*, these circumstances are susceptible to an inference of bad faith on the part of the County. Therefore, even if the *Younger* doctrine applies, the bad faith exception to that doctrine *also* applies, meaning that *Younger* abstention is not proper here.

**1.2 *Colorado River* abstention is improper because the state and federal actions are not parallel and because the majority of factors favor retention of jurisdiction.**

The County next argues for abstention under the *Colorado River* doctrine, but it again ignores the strong preference for federal courts to assert their jurisdiction. Because "federal courts have a 'heavy obligation' to exercise jurisdiction, 'only the clearest of justifications will warrant dismissal' of the federal action in deference to a concurrent state proceeding in the name of wise judicial administration." *AAR, Int'l, Inc. v. Nimelisa Enters. S.A.*, 250 F.3d 510, 517 (7th Cir. 2001) (quoting *Colorado River*)). For that reason, the federal court's task in determining whether abstention is appropriate is "not to find some substantial reason for the *exercise* of federal jurisdiction by the district court, … [but] rather…to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the *surrender* of that jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25–26 (1983) (emphases original). "If there is any substantial doubt that the parallel litigation will be 'an adequate vehicle for the complete and prompt resolution of the issues between the parties,' it would be a '*serious abuse of discretion*' for the district court to stay or dismiss a case in deference to the parallel litigation." *AAR, Int'l*, 250 F.3d at 518 (quoting *Moses H. Cone*, 460 U.S. at 28) (emphasis added).

The first step in the *Colorado River* inquiry is whether the actions are parallel. If they are not, then the *Colorado River* doctrine does not apply. *Id.* In evaluating whether the two actions are parallel, the "question is not whether the suits are formally symmetrical, but whether there is a substantial likelihood that the foreign litigation will dispose of all claims presented in the federal case." *Id.*

This case does not meet that test. The only matters still remaining in the state court relate to enforcement of the Settlement Agreement. And as explained above, the Huffs' claims in federal court are unrelated to or encompassed by any of the provisions of the

Settlement Agreement. Their claims are based on things that have happened since October 2020, and the trial court's enforcement of the Settlement Agreement will not dispose of *any* of the Huffs' federal claim, much less *all* of them. *See id.* at 520 (party's "other claims are not currently before the Greek courts in any of the Greek actions, and it does not seem likely that any of the Greek courts will resolve the legal and factual issues supporting those claims in deciding the claims actually before them"). If, for example, the County were to prevail in full on its Motion to Enforce the Settlement Agreement, it would not defeat any of the Huffs' claims in the federal action. Indeed, if this Court were to abstain and stay, it leaves a very real question: what, specifically, would the Court be waiting for to lift the stay? Additionally, "it is not necessarily the case that the issue presented by [the County] in the foreign action must be resolved before the district court can rule on the claim presented in the federal action." *Id.* at 521.

Moreover, while the County maintains (incorrectly) that the Huffs could inject all of these brand-new claims, based on new facts, into the nearly-resolved state action, it has never claimed (nor could it) that the claims raised here are compulsory counterclaims. But *even if they were*, that wouldn't matter: "the appellees point to no authority (nor have we found any) suggesting that a federal action is parallel to a state or foreign action for *Colorado River* abstention purposes when the claim upon which the federal action is based is pleadable as a compulsory counterclaim in the other action." *Id.* at 522.

Because "any doubt regarding the parallel nature of the foreign suit should be resolved in favor of exercising jurisdiction," *id.* at 520, the Court should find that the two actions here are not parallel and that the *Colorado River* doctrine does not apply.

Even if the Court finds that the actions are parallel, the *Colorado River* factors weigh against abstention. The *first* factor—whether the state has assumed jurisdiction over property—does not apply. *Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (7th

Cir. 2014). The *second* factor—the inconvenience of the federal forum—does not favor abstention, given that Indianapolis is a mere hour north of Monroe County and is also where the County's attorneys in this matter are located. *Id.*

The *third* factor is the desirability of avoiding piecemeal litigation. *Id.* As explained above, the claims and facts at issue in the two actions are distinct—resolution of the state action will not impact the federal action, and vice versa. There is thus no risk of inconsistent rulings. And the mere fact that there is some factual overlap because of the background facts needed as context for the primary facts at issue in the federal litigation is not enough to qualify as piecemeal litigation. *See Stewart v. W. Heritage Ins. Co.*, 438 F.3d 488, 492 (5th Cir. 2006) ("While duplicative litigation is permitted, *Colorado River* prevents *piecemeal* litigation, and the concomitant danger of inconsistent rulings…") (cleaned up; emphasis original). Nor is there any risk of "redundancy" or "wasteful litigation" because the state action has all but concluded, and the federal action will not retread the same ground. *Freed*, 756 F.3d at 1022. As a result, this factor does not weigh in favor of abstention.

The *fourth* factor—the order in which jurisdiction was obtained by the concurrent forums—"should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone*, 460 U.S. at 21. At first blush, this factor may appear to favor abstention, as the state court action was filed first and has been in process for years. But the state court action is so far along that it is all but finished, meaning that the scope of remaining issues is so narrow that there is no need for this Court to wait for the state court to take its final actions. This also shows that the *seventh* factor—relative progress of the state and federal proceedings—does not favor abstention. As such, neither factor favors abstention.

The *fifth* factor—source of governing law—does not favor abstention, as the federal complaint includes claims based both in federal and state law. *Freed*, 756 F.3d at 1022.

The *sixth* factor—adequacy of the state court action to protect the Huffs' rights—weighs strongly against abstention. *Id.* The parties have settled all claims in that litigation. The only thing left to do is determine the confines of the Settlement Agreement and enforce its terms when needed. The County would no doubt argue strenuously against any attempt by the Huffs to add new claims, new facts, and new evidence at this point, and if the Huffs did so, it would likely jettison the agreement the parties worked so hard to reach. That forum offers no chance for the Huffs to seek redress for the new, current, ongoing violations of their federal constitutional rights.

The *eighth* factor—the presence or absence of concurrent jurisdiction—does not move the needle either way, as the claims in each action are wholly distinct from one another. The *ninth* factor is the availability of removal, and with this factor, the "unavailability of removal *favors* a stay, because the purpose of this factor is to prevent litigants from circumventing the removal statute." *Loughran v. Wells Fargo Bank, N.A.*, 2 F.4th 640, 650 (7th Cir. 2021) (emphasis original). Here, had the Huffs wished to remove the original state court action to federal court, they could have done so based on federal question jurisdiction because their counterclaims included claims under the U.S. Constitution. Therefore, this factor does not weigh in favor of abstention.

The *tenth* factor—the vexatious or contrived nature of the federal claim—does not weigh in favor of abstention. As noted above, the evidence supports a conclusion that it is *the County*, not the Huffs, which is acting with bad faith. The Huffs filed the federal action years after the parties had settled the state action, seeking redress for new violations of their federal and state constitutional rights. After the Huffs sued, the County filed a Motion to Enforce the Settlement Agreement in the state action and is now seeking abstention based on that motion. The County's gamesmanship should not be countenanced.

Given the strong preference for federal courts to exercise their jurisdiction, and the fact that none of the ten factors weighs strongly in favor of abstention, the Court should deny the County's motion to abstain under the *Colorado River* doctrine.

### 1.3 Catch-all abstention is improper because all that's left in the state court is enforcement of the final Settlement Agreement.

For all the reasons already discussed at length, abstention—whether under *Younger*, *Colorado River*, or neither—is not proper here. Nothing in the federal action will in any way interfere or overlap with the state court action, as the only thing left there is enforcement of the Settlement Agreement. And none of the claims here can fairly be said to fall under the Settlement Agreement, meaning that the Huffs have no means of redress in the state action for the new and ongoing violations of their constitutional rights. That is also why the fact that the state trial court retained jurisdiction over the Settlement Agreement is irrelevant here—because the claims here do not relate to the parties' compliance with its terms.

Nothing here presents an "extraordinary and narrow" circumstance that qualifies for the narrow exception to the "virtually unflagging obligation" of the Court to exercise its jurisdiction. Therefore, the Huffs respectfully ask that the Court deny the County's request to abstain.

### 1.4 If abstention is proper, the federal action should be stayed, not dismissed.

If the Court ends up concluding that abstention is proper, this matter should be stayed rather than dismissed. *See Woodard*, 997 F.3d 714, 724–25 ("Generally—at least in the context of the *Younger* abstention doctrine—staying the case, rather than an all-out dismissal of a claim, is the proper disposition where [as here] a plaintiff seeks compensatory damages."); *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 503 n.9 (7th Cir. 2011) ("When abstention is appropriate under *Colorado River*, our circuit has a strong preference for a stay rather a dismissal of the federal suit."). So if the Court determines that it will abstain, the Huffs respectfully ask that this matter be stayed, not dismissed.

**2. The equal protection claim (Count 1) should not be dismissed because the Huffs sufficiently allege they were treated differently than similarly situated landowners and there is no rational basis for the County's actions.**

To state a "class-of-one" equal protection claim, a plaintiff must allege that he was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (cleaned up). The Huffs have met this burden.

**2.1 The Huffs have satisfied their pleadings-stage burden of alleging they were treated differently than similarly situated individuals.**

Plaintiffs alleging class-of-one equal protection claims are not required to identify specific examples of similarly situated persons in their complaints. *Capra v. Cook Cnty. Bd. of Rev.*, 733 F.3d 705, 717 (7th Cir. 2013). As the Seventh Circuit has explained,

> Even in a case where a plaintiff would need to identify a similarly situated person to prove his case, ... we see no basis for requiring the plaintiff to identify the person in the complaint.... Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Even the more demanding pleading requirements under *Iqbal* and *Twombly* do not require a plaintiff to identify specific comparators in a complaint.

*Geinosky v. City of Chicago*, 675 F.3d 743, 748 n.3 (7th Cir. 2012). Beyond that, "[a]s a general rule, whether individuals are similarly situated is a factual question for the jury," meaning that such a determination is generally not appropriately decided at the pleadings stage. *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004).

In *Capra*, the Seventh Circuit noted in dicta that the district court erred in applying too-stringent pleading requirements for a class-of-one equal protection claim. 733 F.3d at 717. The district court found that the plaintiff had not stated a claim based on his failure to identify, in his complaint, similarly situated individuals who were not subject to the same (allegedly improper) treatment. *Id.* The Seventh Circuit disagreed, concluding that plaintiff's general allegation that similarly situated individuals were treated differently was sufficient at the pleadings stage. *Id.* at 718.

The Second Amended Complaint readily meets the *Geinosky-Capra* test. In fact, the Huffs have gone beyond what the Seventh Circuit requires. Stephen Smith's affidavit sets forth, in detail, how the County has singled out the Huffs for different treatment than all other similarly situated property owners. (Dkt. 45, ¶ 163.) Before the Huffs, the Planning Department was never involved in the septic permitting process. (*Id.*, ¶ 167.) And Smith has observed a continuing pattern of new rules, requirements, and denials imposed on the Huffs' property that he has never seen before on any other project over the course of his forty-year career. (*Id.*, ¶ 169.).

Smith has never seen so many applications being "stopped" for no reason. (*Id.*, ¶ 170.) Since the Planning Department began "stopping" applications in 2021, Smith Design Group has submitted 112 separate applications—of those, 28 have been stopped. Of those 28, 6 were stopped by the owner or because of an error; the remaining 22—the *only* stoppages enacted by the County—belong to the Huffs. (*Id.*, ¶ 171.) In forty years, the Huffs are the only property owners who have been treated this way by the County. (*Id.*, ¶ 172.)

At the pleading stage, these assertions sufficiently allege that the County has treated the Huffs differently than other, similarly situated property owners.

**2.2 The County had no rational basis for its actions.**

The Huffs have also met their burden at the pleading stage of alleging that there was no rational basis justifying the County's actions. Although "[a]ll it takes to defeat [a class-of-one] claim is a conceivable rational basis for the difference in treatment," even at the pleadings stage, the Huffs have sufficiently alleged the absence of a rational basis underlying the County's actions. *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013).

Citing *John C. & Maureen G. Osborne Revocable Fam. Tr. v. Town of Long Beach*, the County states that protecting Lake Monroe provides a rational basis for the County's actions, and no further inquiry is needed. In *Osborne*, the relevant construction related to seawalls, which would have directly impacted the shoreline of Lake Michigan. No. 3:17-

CV-227 JD, 2018 WL 1471903 (N.D. Ind. Mar. 26, 2018). Here, in contrast, there is no evidence that the County actually believes that the Huffs' development of their property would harm Lake Monroe.

At the July 16, 2020 hearing on the County's Motion for Preliminary Injunction in the state court action, which occurred prior to execution of the Settlement Agreement, the County first argued that the Huffs' activities, which purportedly could cause grading and/or erosion issues around Lake Monroe, would harm the drinking water.

Yet at the same hearing, Lee Baker, the County's attorney, explicitly backtracked, admitting that there was *no* evidence of the Huffs' actions harming Lake Monroe:

> I'm not making any accusation against the Huffs that they have damaged the water. We [the County] don't have proof of it. And I'm not, not gonna go there, but I, the only point was that Lake Monroe is a significant part of Monroe County geography and it, and it has weight in the, in the zoning process. That is it.

(Dkt. 45, ¶ 97; Dkt. 45, Ex. 24, p. 53:12-16.)

Because the County relies exclusively on its interest in protecting Lake Monroe as the rational basis supporting its actions, and such reliance is belied by the County's own statements in the state court proceedings, the Huffs have sufficiently alleged that there was no rational basis supporting the County's actions.

### 2.3 The County's actions were based on personal animus against the Huffs.

The Seventh Circuit has recognized on several occasions that "[a] class of one equal protection claim may be brought where … there is no rational basis for the difference in treatment **or** the cause of the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant." *Lunini v. Grayeb*, 395 F.3d 761, 768 (7th Cir. 2005) (cleaned up) (emphasis added).

Here, the County has singled out the Huffs for differential treatment based on the County's illegitimate animus against them. The inequities noted by Stephen Smith, *supra*,

are only the tip of the iceberg. Since executing the Settlement Agreement, the Huffs have jumped through hoop after hoop to further their rightful development of their property. The Huffs have undertaken every action demanded by the County and are essentially running in circles, having made no progress on their initiatives. (*See* Dkt. 45, ¶¶ 105-134.)

As previously explained, the County had no rational basis for its actions. The only conclusion left to draw is that an illegitimate animus against the Huffs serves as the sole motivation for the County's actions.

For all these reasons, the Court should not dismiss the Huffs' class-of-one Equal Protection claim.

### 3. The procedural due process (Count 3) and vagueness (Count 4) claims should not be dismissed because the Huffs' allegations are sufficient to state a claim.

A law "fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03 (1966). "It is well-settled that zoning ordinances must be precise, definite, and certain in expression so as to enable both the landowner and the municipality to act with assurance and authority regarding local land use decisions." *The Kroger Co. v. Plan Comm'n*, 953 N.E.2d 536, 540 (Ind. Ct. App. 2011); *see also T.T. Thom Constr., Inc. v. City of Jeffersonville*, 721 N.E.2d 319, 324 (Ind. Ct. App. 1999) (this requirement is dictated by due process considerations in that the ordinance must provide fair warning as to what the governing body will consider in making a decision).

In its Opening Brief, the County relies extensively on the protections afforded to citizens under Indiana's Zoning Enabling Act. (Dkt. 49, pp. 22-23.) But the Huffs do not challenge Indiana's Zoning Enabling Act; the Huffs challenge the Monroe County Ordinances that have made it impossible for the Huffs to even *present their arguments to the Board of Zoning Appeals*, as permitted under the Zoning Enabling Act. The Huffs challenge the site plan approval process set forth in Monroe County Zoning Ordinance Chapter 815

("Chapter 815"), whose language is vague and leaves the Administrator with too much discretion in enacting the Ordinance. (Dkt. 45, pp. 51-53.)

The unfettered discretion and lack of clear and unambiguous language in Chapter 815 renders it much like the ordinance struck down as unconstitutional in *Hendricks Cnty. Bd. of Comm'rs v. Rieth-Riley Constr. Co.*, 868 N.E.2d 844, 849–50 (Ind. Ct. App. 2007). There, the court concluded that the ordinance lacked the necessary specificity as it gave the plan commission "unfettered power to deny development plans if it decides, by whim or otherwise, that the plan contravenes one of the factors listed in the Ordinance." *Id.* at 853. Thus, the court determined that the ordinance failed to provide landowners with "fair warning as to what the governing body will consider when formulating its decision." *Id.*

Chapter 815 similarly provides the Administrator unfettered discretion to deny a permit application and unbounded authority to condition the permit on any additional terms he or she deems "necessary and reasonable." Monroe Cnty. Zoning Ord. Ch. 815-3. Beyond that, Chapter 815 is subjective and vague, conferring overly broad discretion to the issuing authority that is insufficient to guide the County's permitting decisions. As an example, Chapter 815-3(B) states:

> The Administrator shall consider and evaluate such application and associated site plan, and thereupon render a decision in writing, which decision shall consist of either:
>
> (1) approval of the site plan based upon the determination that the proposed plan complies with the general, design and performance standards set forth in this ordinance;
>
> (2) disapproval of the site plan based upon the determination that the proposed project does not meet the general, design or performance standards set forth in this ordinance; or
>
> (3) approval of the site plan subject to any conditions, modifications, and restrictions as required by the Administrator which will

> ensure that the project meets the general, design and performance standards set forth in this ordinance.

There are no enumerated criteria that would allow a site plan application to be "stopped," but that is exactly what has happened here repeatedly. As discussed above, the Huffs have tried to comply with every requirement the County has set forth since executing the Settlement Agreement. (*Supra*, pp. 3-5). The County continues to "stop" its site plan applications using arbitrary and, oftentimes, false or incorrect justifications.

The Huffs explain extensively in their Second Amended Complaint exactly how each purported justification is false or incorrect. (Dkt. 45 at pp. 34-38, ¶¶ 150-52.) For example, the given justification for stopping Site Plan Applications SSIT-22-12 and SSIT-22-13 (for an agricultural barn and guest home, respectively) included assertions that the site plan was missing (1) an illustration of "all structures (including septic connection lines, culverts, etc.) listing setbacks from property lines;" (2) "a subscribed statement of an engineer or architect, licensed by the State of Indiana, certifying that the proposed activity will satisfy the performance standards of Chapter 802 of this ordinance;" and (3) "more." In actuality, the site plan applications included (1) all the information requested by the County, including identification of the septic tank and property setbacks and that there are no culverts (Dkt. 45, Ex. 32); and (2) the seal and signature of Clete A. Kunce as certification (*Id.*, Ex. 33). As for the third item, the County has refused to provide additional details about what "more" was missing from the applications.

Each of the given reasons for stopping the site plan applications is rebutted in the Second Amended Complaint. (*Id.* at pp. 34-38, ¶¶ 150-52.) But because the County refuses to issue outright denials, and only "stoppages," the Huffs have no recourse. The Huffs have no ability to present their case to the Board of Zoning Appeals because of the County's dilatory tactics. There is no mechanism in Chapter 815 providing the Huffs a path to move their plans for their property forward; the County and its Administrator hold all the vague cards. Given the lack of legitimate justification for the County's actions,

and because the County is acting pursuant to its authority under Chapter 815, Chapter 815 is unreasonably vague and denies the Huffs the procedural due process to which they are entitled.

These allegations suffice to state a claim for violating the Huffs' procedural due process rights and for vagueness. Therefore, the County's Motion to Dismiss Counts 4 and 5 should be denied.

### 4. The takings claim (Count 6) should not be dismissed because it is ripe and properly pleaded.

When a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a "final" decision. *Pakdel v. City and Cnty. of San Francisco*, 141 S. Ct. 2226, 2228 (2021). This finality requirement contemplates that a regulatory takings claim is not ripe until the plaintiff has received a "final decision regarding the application of the [challenged] regulations to the property at issue" from "the government entity charged with implementing the regulations." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985). The finality requirement is relatively modest; all a plaintiff must show is that "there [is] no question … about how the regulations at issue apply to the particular land in question." *Pakdel*, 141 S. Ct. at 2230 (cleaned up).

The various rationales for the finality requirement underscore that "nothing more than *de facto* finality is necessary." *Id.* This requirement ensures that a plaintiff has actually "been injured by the government's action" and is not "prematurely suing over a hypothetical harm." *Id.* Along the same lines, because a plaintiff who asserts a regulatory taking must prove that the government "regulation has gone too far," the court must first "kno[w] how far the regulation goes." *Id.* (cleaned up). Once the government is committed to a position, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution. *Id.*

The County asserts that the Huffs' regulatory takings claim is "nowhere close to being ripe" because the County has not reached a final decision about any of the permit or application requirements and could thus "reconsider" its findings, and because the Huffs could purportedly appeal the County's decisions through the Board of Zoning Appeals. (Dkt. 49, pp. 27-28.) But this ignores the principle that the finality requirement is satisfied when the "government is committed to a position." *Pakdel*, 141 S. Ct. at 2230. The County is committed to its position of preventing the Huffs from enjoying the economic benefits of their land and preventing the Huffs from presenting their case to the Board of Zoning Appeals for the reasons discussed herein. (*Supra*, pp. 23-26.) *See also Palazzolo v. Rhode Island*, 533 U.S. 606, 620-21 (2001) ("Government authorities, of course, may not burden property by imposing repetitive or unfair land-use procedures in order to avoid a final decision."). If a decision from the BZA is a requirement for finality, then the Huffs will never have a right to seek redress for these violations of their constitutional rights so long as the County "stops," but doesn't deny, their applications. That simply cannot be the result.

This is not a case in which the County has "merely" delayed the Huffs' permits and applications for a matter of months or even a single year (Dkt. 49, p. 29); it has now been nearly two years since the parties executed the Settlement Agreement, and the County continues to come up with unsupported reasons for why the Huffs cannot move forward with developing their property. The justifications proffered by the County for its refusal to provide the Huffs with the requisite permits to develop their property are either blatantly false or have been corrected. (*Supra*, pp. 23-26; Dkt. 45, pp. 34-38.)

The Huffs are individuals seeking to build private residences on their property for themselves and their family. The minimal progress the Huffs have made (*e.g.*, limited logging activity and approval, after more delays, of septic permits) still deprives the Huffs of much of the economically beneficial use of the property. The County has not

permitted the Huffs to begin construction on their personal residences, let alone an agricultural barn to store equipment, straw, seed, and other agriculture-related materials. All of these impediments result from the County's commitment to preventing the Huffs from enjoying the economically beneficial use of their property. The Huffs have properly alleged their takings claim, especially at this early stage of litigation.

For all these reasons, the motion to dismiss the Huffs' takings claim should be denied.

**5. The substantive due process claim (Count 2) should not be dismissed because the Huffs have alleged multiple viable claims under federal law and there is no rational basis for the County's actions.**

When a substantive due process challenge involves only the deprivation of a property interest, a plaintiff must show "either the inadequacy of state law remedies or an independent constitutional violation" before the court will engage in rational basis review. *Doherty v. City of Chicago*, 75 F.3d 318, 323–26 (7th Cir. 1996). Here, the Huffs have both sufficiently pleaded independent constitutional violations (Argument Sections 2-4, *supra*) and the inadequacy of state law remedies.

As discussed, the Huffs have no ability to seek relief from the Board of Zoning Appeals, despite the County's assertion that such a path remains open to them (Dkt. 49, pp. 31-32), because of the County's dilatory actions regarding the Huffs' pending permits and applications. And the Huffs have no ability to seek redress for the County's post-Settlement Agreement misconduct, because the ongoing state court proceedings relate solely to enforcement of the Settlement Agreement and nothing else, contrary to the County's assertions in its Opening Brief. (Argument Section 1, *supra*; Dkt. 49, p. 31.) Thus, in addition to their independent constitutional violations, the Huffs have also shown the inadequacy of state law remedies.

Beyond that, the County had no rational basis to justify its actions, for the reasons set forth previously. (Argument Section 2, *supra*.) Despite the County claiming its actions were undertaken to protect Lake Monroe, the County explicitly acknowledged in open

court that the Huffs have not damaged the lake, the shoreline, or the water. (Dkt. 45, ¶ 97; Dkt. 45, Ex. 24.) For these reasons, the Huffs' substantive due process claim should proceed.

**6. Because the Huffs' federal claims survive dismissal, this Court should retain supplemental jurisdiction over their state law claims (Counts 5 and 7).**

For the reasons set forth in this brief, each of the Huffs' federal claims should proceed in this Court. Accordingly, this Court should retain supplemental jurisdiction over the remaining state law claims. Beyond that, and as mentioned previously, the County's insistence that the Huffs' injuries can be addressed in the state action is simply untrue. The state action remains pending solely to enforce the Settlement Agreement; it does not remain pending to address new issues related to the County's conduct after execution of the Settlement Agreement. For these reasons, the Huffs should be permitted to pursue their state law claims in this proceeding.

WHEREFORE, Plaintiffs respectfully ask that the Court deny the Defendants' Motion to Dismiss the Second Amended Complaint. In the alternative, if the Court elects to abstain, the Huffs ask that the Court stay this action rather than dismiss it.

DATED:  October 4, 2022

Respectfully submitted,

/s/ Blake J. Burgan

Blake J. Burgan, # 18350-49
Chou-il Lee, #21183-53
Nadine E. McSpadden, #25420-49
Jeffrey W. Parker, Jr., #35742-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204
Phone: 317.713.3500
Fax: 317.713.3699
bburgan@taftlaw.com
clee@taftlaw.com
nmcspadden@taftlaw.com
jparker@taftlaw.com